## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

**CHAZ D. PINKSTON, #148934**  **PLAINTIFF**

**VERSUS**  **CIVIL ACTION NO. 5:18cv103-DCB-MTP**

**PELECIA HALL, ET AL**  **DEFENDANTS**

---

## MEMORANDUM IN SUPPORT OF THE CENTURION DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

Defendants Centurion of Mississippi, LLC ("Centurion"); Eshunna Robinson ("Nurse Robinson"); April Meggs ("Meggs"); Nathaniel Reed ("HSA Reed"); and Dr. James Burke ("Dr. Burke") (collectively the "Centurion Defendants"), through counsel, submit this Memorandum of Law in support of their Motion to Summary Judgment. In this lawsuit, Plaintiff Chaz D. Pinkston ("Plaintiff") complains that Nurse Robinson insufficiently treated his May 15, 2018 injuries; that his "numerous" sick calls went ignored after his arrival at Wilkinson County Correctional Facility ("WCCF"); that his requests for treatment of his skin conditions were ignored; and that the skin treatment he received was insufficient. Plaintiff's medical records reveal the contrary. Plaintiff received medical treatment when requested, and any delay was typically due to facility lockdowns or Plaintiff not being transported to medical. Even so, Plaintiff cannot show that any delay caused substantial harm. Likewise, Plaintiff received treatment for his skin conditions at WCCF; Plaintiff just disagrees with that treatment and the fact that he was not sooner referred to an offsite dermatologist. But such disagreement cannot support a Section 1983. In sum, the Centurion Defendants are entitled to summary judgment on Plaintiff's claims against them.

<u>**Factual Allegations and Procedural History**</u>

On October 1, 2018, Plaintiff, a *pro se* litigant incarcerated at WCCF at all relevant times, filed this lawsuit.  [Doc. 1].  Plaintiff later amended and clarified his claims at an omnibus hearing.[1] Based on that hearing, the Court issued an Omnibus Order, designating the remaining claims. [Doc. 146] at 1.

**A.      Complaint and omnibus hearing testimony.**

In this lawsuit, Plaintiff has sued a wealth of individuals, about a variety of issues spanning different periods of time.  For the sake of brevity, the Centurion Defendants will recount only those facts that pertain to Plaintiff's claims against them.

**1.   Nurse Robinson treated Plaintiff's March 15, 2018 injuries, but not to Plaintiff's standards.**

Plaintiff contends that on May 15, 2018, Defendants Robert King and Briana Chester were escorting Plaintiff to the law library when Plaintiff complained that his leg restraint was too tight and cutting off his leg's circulation.  *See* **Omnibus Hearing Transcript**, attached to Motion as **Ex. A**, at 26-27; [Doc. 146] at 3.  In response, Defendant Michael Johnson supposedly placed his finger under the restraint and determined it did not need to be loosened.  Ex. A at 26.  As Plaintiff was leaving the law library, he allegedly fell and was carried by his hand restraints to the zone, supposedly causing the restraints to cut into his hands.  *Id.* at 27.  When Plaintiff reached the zone, Defendant Michael Johnson allegedly slammed Plaintiff's head against a wall, causing his eye to swell into a large knot.  *Id.* at 28-29; [Doc. 146] at 3.

---

[1]      An omnibus hearing, otherwise known as a *Spears* hearing, "affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  *Davis v. Scott*, 157 F.3d 1003, 1005-06 (5th Cir. 1998).  The hearing "is in the nature of an amended complaint or a more definite statement."  *Adams v. Hansen*, 906 F.2d 192, 194 (5th Cir. 1990).  The omnibus hearing "supersedes" claims made in the complaint.  *Riley v. Collins*, 828 F. 2d 306, 307 (5th Cir. 1987).

Defendants Bryan Gaston and Terry Daniels supposedly would not take Plaintiff to the medical clinic. Ex. A at 32; [Doc. 146] at 3. Instead, Nurse Robinson came to the hallway and checked Plaintiff's blood pressure and temperature. *Id.* Plaintiff contends this was not enough, that Nurse Robinson should have examined Plaintiff's wrists, ankles, and knot, or given Plaintiff something for his eye. Ex. A at 32-33, 35; [Doc. 146] at 3. According to Plaintiff, his eye lost sight later that night and then became infected. Ex. A at 32, 34. Plaintiff contends he did not receive medical treatment for his eye until two weeks later. *Id.* at 33. At that time, the treating nurse prescribed medications for Plaintiff's eye and supposedly stated Plaintiff should have gotten a cold pack for his May 15, 2018 injuries. *Id.* at 34.

### 2. Plaintiff is dissatisfied with the timing and extent of treatment his skin treatment.

Plaintiff's claims against the remaining Centurion Defendants concern Plaintiff's sick call requests and treatment for his skin conditions. *See* [Doc. 146] at 4. Plaintiff contends that from the time he arrived at WCCF on January 24, 2018, he submitted numerous sick call requests, seemingly about his failure to receive an intake screening, but did not get responses or transported to the medical clinic. Ex. A at 39. Plaintiff does not specify how many sick call requests he submitted, to whom he submitted them, or when he submitted them. Plaintiff also complains that other inmates in maximum security supposedly did not receive medical care in response to their sick call requests. *Id.* Plaintiff blames HSA Reed and Dr. Burke for this alleged deficiency, seemingly because of their positions. *Id.* (noting HSA Reed is head administrator for medical at WCCF).

Primarily, Plaintiff complains about the treatment of his skin conditions. According to Plaintiff, he has submitted several sick calls concerning his skin conditions but has not received responses or sufficient treatment. *Id.* at 42. According to Plaintiff, Dr. Burke, HSA Reed, and

Meggs are to blame for this because they are the chain of command for determining who receives offsite medical treatment. *Id.* at 42-43. Plaintiff contends that Dr. Burke and HSA Reed requested Plaintiff be sent to an offsite dermatologist. *Id.* at 45. According to Plaintiff, however, the "upper chain"—Meggs, Defendant Mike Hatten, and Defendant Gloria Perry—initially refused this request because no offsite dermatologist would see MDOC inmates. *Id.* at 45-46, 103. But Plaintiff admits that he was seen for his skin conditions three or four times in 2018 and three times in 2019, that he has been provided skin creams and ointments (although he claims they were ineffective), and that he has been to a dermatologist on two occasions since he filed this action. *Id.* at 45, 104; Ex. A at 40.

### B. Plaintiff's pertinent medical records.

Pinkston was transferred to WCCF on or around January 24, 2018. **Compilation of Plaintiff's Pertinent Medical Records**, attached to Motion as **Ex. B**, at Pinkston v Centurion 000126. At that time, his transfer form and medical record were reviewed for current medications, treatments, pending consults, and required follow up for medical/dental care. *Id.* at Pinkston v Centurion 000124-25. On January 28, 2018, Plaintiff had a mental health visit and "immediately threaten[ed] to go on a hunger strike if he d[id] not see medical regarding his lotion and other medical related issues/supplies." *Id.* at Pinkston v Centurion 000123. He insisted that "by policy" he was supposed to see a doctor within 24 hours of transfer and needed his "lotion." *Id.* He initially told the mental health provider he had yet to see a doctor, but then admitted to maybe having seen a medical provider. *Id.* Nevertheless, the mental health provider referred Plaintiff to the medical clinic in response. *Id.*

Plaintiff's Prednisone and Lubrisoft lotion were refilled the next day. *Id.* at Pinkston v Centurion 000121. Plaintiff was scheduled for an appointment on January 30, 2018, but had to be

rescheduled several times due to Plaintiff not be transported by security to medical or WCCF being on lockdown.  *Id.* at Pinkston v Centurion 000104-20.   Plaintiff was seen for Chronic Care on April 24, 2018, and prescribed a trial of Betamethazone ointment for his skin conditions.  *Id.* at Pinkston v. Centurion 000100.

Plaintiff submitted his first Medical Service Request at WCCF on May 10, 2018, claiming his hand was smashed in a tray flap.  *Id.* at Pinkston v Centurion 000229.  Plaintiff was scheduled for an appointment on May 12, 2018.  *Id.* at Pinkston v Centurion 000097.  But between then and May 21, 2018, that appointment was rescheduled numerous times due to facility lockdowns and Plaintiff not being transported by security to the medical clinic.  *Id.* at Pinkston v Centurion 000095-97.  On May 22, 2018, Keshia Hartfield, RN saw Plaintiff for pain in his left hand, in response to his May 10, 2018 Medical Service Request; but that time, Plaintiff verbalized that the problem was resolved.  *Id.* at Pinkston v Centurion 000094.

That same day, Dr. Burke treated Plaintiff for pain and redness in his eye, a knot above his eye, and tingling in his wrists and hands from the handcuffs, as complained of in Plaintiff's May 10, 2018 Medical Service Request.  *Id.* at Pinkston v Centurion 000092.  Dr. Burke noted a contusion, lateral subconjunctival hemorrhage[2], and a small hematoma[3] around the right eyebrow, but found no evidence of facial fracture of overt injury to Plaintiff's hands.  *Id.*  Dr. Burke prescribed artificial tears and ibuprofen and instructed Plaintiff to apply heat to his forehead and brow area.  *Id.* at Pinkston v Centurion 000093.

---

[2]     A subconjunctival hemorrhage is disorder causing redness in the white of the eye.  *See* Bercin Tarlan and Hayyam Kiratli, *Subconjunctival hemorrhage: risk factors and potential indicators*, available https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3702240/

[3]     A hematoma is a collection (or pooling) of blood outside the blood vessel.  *See* https://www.mercy.com/health-care-services/primary-care-family-medicine/conditions/bruise-hematoma

On June 24, 2018, Plaintiff submitted a Medical Service Request, claiming he was "still awaiting to see Dr. Burke about [the] knot protruding about of [his] right eyebrow" and demanding his "return visit." *Id.* at Pinkston v Centurion 000221.  Plaintiff submitted another Medical Service Request the next week, threatening that if he did not see Dr. Burke in addition to being sent to an offsite dermatologist, he would sue "the entire medical administration before th[e] year end[ed]" and "go[] for [their] licenses through the MS Board of Licensure." *Id.* at Pinkston v Centurion 000220.

On July 3, 2018, Dr. Burke treated Plaintiff in for a same-day complaint of skin irritation. *Id.* at Pinkston v Centurion 000087.  Plaintiff contended his rash was not responding to treatment, and he thought it was due to his receiving Haldol.  *Id.*   Dr. Burke noted that Pinkston's skin conditions had been occurring for two years*. Id.*   Dr. Burke also considered that a biopsy of Pinkston's skin had been performed at the Mississippi State Penitentiary and returned a diagnosis of "infundibular cyst."[4]   *See* **Declaration of James Burke, M.D.**, attached to Motion as **Ex. C**, at ¶11.  Dr. Burke considered this to be non-specific finding and thought that a repeat biopsy would be prudent.  *Id.*   Additionally, he determined a dermatology consult should occur.  Ex. B at Pinkston v Centurion 000087.

Plaintiff was scheduled for chronic care on July 18, 2018, but had to be rescheduled twice because Plaintiff was not transported by security to the medical clinic.  *Id.* at Pinkston v Centurion 000086.

On September 17, 2018, Dr. Burke collected a specimen from Plaintiff's leg to be biopsied. *Id.* at Pinkston v Centurion 000079-80.  Dr. Burke sent the specimen, photographs of Plaintiff's skin, and Plaintiff's previous treatment failures to RubiconMD, an online medical consultation

---

[4]     A benign cyst usually found on the skin.

service, for review by a dermatologist.  *See* Ex. C at ¶13.  A board-certified dermatopathologist reviewed these materials and submitted a report to Dr. Burke.  Ex. B at Pinkston v Centurion 000078.  On October 16, 2018, Dr. Burke conferred with the consulting dermatologist about Plaintiff's skin conditions; the consulting dermatologist considered them to be genetic, treated best by aggressive moisturizing, and recommended certain creams.  *Id.*  Dr. Burke then met with Plaintiff to discuss the results of the biopsy.  *Id.* at Pinkston v Centurion 000069.  Plaintiff demanded an offsite dermatologist, but Dr. Burke determined to follow the recommendations of the consulting dermatologist.  *Id.*  The consulting dermatologist's recommended treatment was submitted and prescribed for Plaintiff in the days thereafter.  *Id.* at Pinkston v Centurion 000066-68.

On October 28, 2018, Plaintiff submitted a Medical Service Request, complaining that he still had not seen a dermatologist regarding his "external and internal damage to [his] skin" and "severe diagnoses."  *Id.* at Pinkston v Centurion 000207.  Three days later, Plaintiff submitted another Medical Service Request demanding to see a dermatologist and threatening Gloria Petty, Centurion, Meggs, HSA Reed, and Dr. Burke that he would "take all [their] monies" and "put [them] in all in prison."  *Id.* at Pinkston v Centurion 000204.  On November 1, 2018, Plaintiff submitted another Medical Service Request contending he needed to see a dermatologist to get his "skin diseases plus their spin-offs treated and [his] skin repaired and all [his] diseases controlled [] for the long term."  *Id.* at Pinkston v Centurion 000205.  Six days later, Dr. Burke met with Plaintiff, who again demanded to see an offsite dermatologist.  *Id.* at Pinkston v Centurion 000060.  Dr. Burke explained that he had been informed that no dermatologist in Mississippi would see MDOC offenders.  *Id.*  Dr. Burke explained that he did not have the authority to send inmates offsite, and that Plaintiff's current course of treatment was prescribed by a dermatologist.  *Id.*

Plaintiff refused to consent and threatened to challenge Dr. Burke's medical license if Dr. Burke did not do as Plaintiff demanded.  *Id.*

Plaintiff continued to submit Medical Service Requests demanding to see an offsite dermatologist.  *Id.* at Pinkston v Centurion 000175, 181, 183, 192, 197.  Dr. Jeremy Rawson treated Plaintiff on January 17, 2019.  *Id.* at Pinkston v Centurion 000045-46.  Dr. Rawson entered new orders for new ointments to treat Plaintiff's skin conditions.  *Id.*  On February 6, 2019, Plaintiff was seen at the University of Mississippi Medical Center for his skin complaints.  *Id.* at Pinkston v Centurion 000173.  Plaintiff was diagnosed and prescribed various lotions and creams.  *Id.* at Pinkston v Centurion 000170-73.  Upon Plaintiff's return, his new prescriptions were entered.  *Id.* at Pinkston v Centurion 000037-42.

### C.    Plaintiff's pertinent grievances.

Before filing this lawsuit on October 1, 2018, Plaintiff submitted only two grievances through the Administrative Remedy Program ("ARP") that even mention the Centurion Defendants.

### 1.    WCCF-18-196

On April 2, 2018, Plaintiff submitted a grievance that generally complained of Plaintiff's conditions of confinement.  *See* **Compilation of Plaintiff's Pertinent ARP Files**, attached to Motion as **Ex. D**, at MDOC-PINKSTON-002039.  Plaintiff did <u>*not*</u> complain about his medical treatment, his skin conditions, or any unanswered Medical Service Requests.  *Id.*  Plaintiff conclusively stated that ""Centurion administrator's [sic] are most definitely deliberately indifferent and therefore included" and demanded "Medical H.S.A. [and] M.D. Burke" be fired immediately.  *Id.*  This grievance, WCCF-18-196, was rejected as requesting relief beyond the power of the ARP to grant.  *Id.*  at MDOC-PINKSTON-002040.

### 2.  WCCF-18-365

Submitted on May 15, 2018, WCCF-18-365 alleged that Plaintiff had been assaulted for third time that day by Sgt. Johnson.  *Id.* at MDOC-PINKSTON-002049.  Plaintiff contended his hands, wrist, ankles, legs, forehead, eyebrow, and right eye were injured.  *Id.*  Additionally, Plaintiff alleged that "Nurse Robertson" came and "wrote down the lump protruding out of [Plaintiff's] face . . . [but] she refused to examine and note" Plaintiff's alleged wrist injuries and "didn't even give [Plaintiff] an icepack . . . but instead was in and out within two minutes or less." *Id.* at MDOC-PINKSTON-002051.  WCCF-18-365 was rejected as requesting relief beyond the power of the ARP to grant.  *Id.*  at MDOC-PINKSTON-002048.

### Summary Judgment Standard

A motion for summary judgment will be granted only when "the record indicates that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The Court must view "the evidence in the light most favorable to the nonmoving party." *Id.*  The nonmoving party, however, "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.' " *Turner v. Baylor Richardson Med. Center*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In the absence of proof, the Court does not "assume that the nonmoving party could or would prove the necessary facts."  *Little*, 37 F.3d at 1075 (emphasis omitted).

### Authorities and Argument

Plaintiff's claims hinge on Plaintiff's own ideas as to what the medical standard should be, but those claims cannot meet the applicable deliberate-indifference standard.  Plaintiff received

timely treatment for his May 15, 2018 injuries and his skin conditions.  But Plaintiff, in his opinion,

believes that treatment was insufficient. This is not enough for a Section 1983 claim.  Even so,

Plaintiff cannot show that Nurse Robinson's failure to provide additional treatment or the failure

to send Plaintiff to an offsite dermatologist sooner caused Plaintiff any substantial harm.  Similarly,

Plaintiff cannot show that he submitted sick calls that went ignored, or that any delay in requested

medical treatment caused substantial harm. For these reasons, Plaintiff's claims against all

Centurion Defendants must be dismissed.

## I.  Plaintiff did not exhaust his administrative remedies against Dr. Burke, HSA Reed, and Centurion before bringing this lawsuit.

Plaintiff submitted only two pre-lawsuit grievances that even mentioned the Centurion

Defendants.  But neither was sufficiently specific as to Dr. Burke, HSA Reed, or Centurion and

Plaintiff's claims against them.   Consequently, Plaintiff failed to exhaust his administrative

remedies against Dr. Burke, HSA Reed, or Centurion.

### A. The ARP determines whether Plaintiff properly exhausted his administrative remedies.

The Mississippi Department of Corrections ("MDOC") has implemented an administrative

remedy procedure in its facilities: the ARP.  *Carpenter v. Mgmt. and Training Corp.*, No.

3:13cv285–M–A, 2014 WL 4955693, at *2 (N.D. Miss. Oct. 2, 2014).  The ARP is a formal two-

step process which proceeds as follows:

> [I]nmates must make their request to the Adjudicator in writing within a 30 day
> period after an incident has occurred. They are, however, discouraged from making
> repetitive requests and "are encouraged to continue to seek solutions to their
> concerns through informal means.  Prior to the "first step" of this procedure, the
> Adjudicator screens the request to determine whether it meets specified criteria. If
> a request fails to meet that criteria, the Adjudicator will reject it and notify the
> inmate via Form ARP–1.  If the request meets the criteria, however, the Adjudicator
> will accept it into the ARP, and the request will then proceed to the first step.
>
> At the first step, the appropriate MDOC official receives the request via Form
> ARP–1 and provides a "first-step response" to the request via Form ARP–2. If the

inmate is satisfied with this first-step response, he does not need to do anything further.

If unsatisfied, however, the inmate may then proceed to the "second step" by indicating as much on the same Form ARP–2. At the second step, another appropriate MDOC official, such as a warden, provides the "second-step response" via Form ARP–3. If unsatisfied with the second-step response, the inmate may then bring a claim in court.

*Ryan v. Hall*, No. 1:17cv128-HSO-JCG, 2018 WL 4521222, at *4 (S.D. Miss. Sept. 21, 2018) (quoting *Yankton v. Epps*, 652 F. App'x 242, 245 (5th Cir. 2016)) (internal quotations and citations omitted).[5]

A prisoner must do two things to properly exhaust the ARP:  (1) timely complete the entire ARP process and (2) provide sufficient specifics during that process.  The former requirement is simple and objective: A prisoner must comply with the requisite deadlines and, if the grievance is accepted, complete both the first and second step of the ARP.  *See Woodford v. Ngo*, 548 U.S. 81, 95 (2006); *Dowdle v. Fisher*, No. 3:16CV102-HTW-LRA, 2017 WL 3425744, at *3 (S.D. Miss. June 30, 2017).

The latter requirement is more subjective: A prisoner's administrative grievance "must give prison officials 'fair notice' of the problem that will later form the basis of the prisoner's suit." *Sears v. Shaw*, No. 5:14cv65–DCB–JCG, 2016 WL 1068745, at *5 (S.D. Miss. Feb. 1, 2016) (citing *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004)).  "Since prisoners are generally required to follow the procedures adopted by the state prison system, the specificity requirement should be interpreted in light of the grievance rules of the particular prison system." *Johnson*, 385

---

[5]    The ARP derives from the MDOC Inmate Handbook, which is available at http://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf. The Court may take judicial notice of MDOC's Inmate Handbook.  *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see, e.g.*, *Smith v. Polk Cty., Fla.*, No. 805-cv-884-t-24, 2005 WL 1309910, at *3 (M.D. Fla. May 31, 2005) (judicial notice taken of inmate handbook and grievance procedures stated therein).

F.3d at 517.  Thus, in "deciding whether the grievance gives officials an opportunity to address the problem, the Court should consider whether the grievance provides the type of information that the [prison] rules request."  *Sears*, 2016 WL 1068745, at *5 (internal brackets removed).

The ARP requests a prisoner's administrative grievance "present as many facts as possible to answer all the questions who, what, when, where, and how concerning the incident."  *Sears*, 2016 WL 1068745, at *5 (quoting MDOC Inmate Handbook, Ch. VIII, Administrative Remedy Program).  "Effectively, this . . . requires that all officials involved be named or at least referenced by description."  *Hayes*, 2016 WL 884654, at *3.  Additionally, this requires specific complaints be raised and sufficiently described.  *See id.* (citing *Marsalis v. Cain*, Civil Action No. 12-0799, 2014 WL 51215 (M.D. La. Jan. 7, 2014) (claims not raised "and/or were only alluded to so minimally as to be insufficient to provide fair notice to prison officials of the plaintiff's specific complaints..." were unexhausted)).

### B.  Plaintiff's grievances were not sufficiently specific as to Centurion, Dr. Burke, and HSA Reed or Plaintiff's claims against them.

"In determining exhaustion under the PLRA, we look to the processes established by the prison and the parties' use of these processes, *beginning with the sufficiency of the inmate's complaint*."  *Moussazadeh v. Texas Dept. of Criminal Justice*, 703 F.3d 781, 788 (5th Cir. 2012) (internal quotation marks omitted) (emphasis added).  Courts "typically use a standard according to which a grievance should give prison officials 'fair notice' of the problem that will form the basis of the prisoner's suit."  *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004).  The complaint must be sufficient in detail to give officials "time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Moussazadeh*, 703 F.3d at 788 (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)).  "If the complaint meets those standards, *and* if there are no

further avenues for administrative resolution, [the court should] find exhaustion." *Moussazadeh*, 703 F.3d at 788 (emphasis added).

Neither WCCF-18-196 nor WCCF-18-365 meets these standards.  Neither grievance complained of the treatment of Plaintiff's skin condition or the handling of Plaintiff's Medical Service Requests—the issues that underlie Plaintiff's claims against Centurion, HSA Reed, and Dr. Burke.  Rather, WCCF-18-196 made a blanket, conclusory complaint about Plaintiff's conditions of confinement.  This is not enough for exhaustion purposes.  *See Lee v. Epps*, NO. 1:15CV203-LG-RHW, 2017 WL 6211055, at *5 (S.D. Miss. Nov. 9, 2017) (finding grievance "too vague" for exhaustion purposes because "it did not identify a specific day, time, place, or person who committed" the act at issue).

And WCCF-18-365 never mentioned Dr. Burke, Centurion, or HSA Reed, or alleged they were responsible for Nurse Robinson's allegedly insufficient medical care.  Under the ARP, Plaintiff "was not required to present specific legal theories in his grievances, but he was required to provide facts and to alert prison officials of the problem in order to give them an opportunity to address it."  *Sears*, 2016 WL 1068745, at *5.  Plaintiff failed to do so, and therefore failed to exhaust his administrative remedies, even though both grievances were ultimately rejected.  *See Moussazadeh*, 703 F.3d at 788.

## II.   Plaintiff cannot show deliberate indifference to his serious medical needs.

Exhaustion aside, Plaintiff's claims against the Centurion Defendants fail because Plaintiff cannot show deliberate indifference to his serious medical needs.

In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth

Amendment ... whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1978).  The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994).  Under this standard, a state actor is not liable under 42 U.S.C. § 1983 unless the plaintiff alleges facts which, if true, would demonstrate that the prison official (1) knew that the inmate faced a substantial risk of serious harm; and (2) disregarded that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847.

Not all conduct, however, meets this standard.  For example, negligent conduct by a prison official does not give rise to a constitutional violation. *Daniels v. Williams*, 474 U.S. 327 (1986); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990).  In fact, even if physicians misdiagnose or mistreat the plaintiff's condition in what amounts to medical malpractice, a prisoner cannot sustain a Section 1983 claim without a showing of deliberate indifference. *See, e.g., Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (finding medical malpractice alone does not support Section 1983 cause of action).  In addition, a plaintiff's disagreement with the course of medical treatment chosen will not support a claim of deliberate indifference. *See, e.g., Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 2001); *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001).

Rather, liability under the deliberate indifference standard requires the plaintiff to produce evidence "that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Davidson v. Texas Dept. of Crim. J.*, 91 Fed. App'x. 963, 965 (5th Cir. 2004) (citation omitted); *see also Gobert v. Caldwell*, 463 F.3d 339, 346 (5th

Case 5:18-cv-00103-MTP   Document 217   Filed 11/15/19   Page 15 of 23

Cir. 2006) (holding that deliberate indifference requires the inmate to show that prison officials engaged in conduct "that would clearly evince a wanton disregard for any serious medical needs").

### A. Plaintiff's claim against Nurse Robinson amounts to mere disagreement—not deliberate indifference.

Plaintiff's claim against Nurse Robinson is entirely based on his dissatisfaction with her medical treatment. Plaintiff concedes Nurse Robinson treated his injuries on May 15, 2018—the same day Plaintiff received them. A Section 1983 claim cannot stand on Plaintiff's or another nurse's opinion that different or additional treatment was necessary.[6] *See Gobert*, 463 F.3d at 346 (noting inmate's disagreement with his medical treatment cannot support a Section 1983 claim, absent exceptional circumstances); *Stafford v. Kelly*, No. 4:09CV133–WAP–JAD, 2011 WL 2633034, at *2 (N.D. Miss. June 3, 2011) ("The fact that one doctor recommended a particular course of treatment and that the treatment was not provided is not evidence of deliberate indifference.").

Even so, Plaintiff cannot show that Nurse Robinson's allegedly deficient treatment resulted in any harm. Plaintiff did not, as he contends, wait two weeks to receive additional treatment. Rather, Dr. Burke treated Plaintiff within one week, noting a contusion, lateral subconjunctival hemorrhage, and a small hematoma around the right eyebrow, but finding no evidence of facial fracture or overt injury to Plaintiff's hands—much less the eye infection and blindness Plaintiff contends he suffered. *See* Ex. A at Pinkston v Centurion 000092-93. There is no evidence that Nurse Robinson's failure to give Plaintiff a cold pack or additional or different treatment on May 15, 2018 caused or worsened Plaintiff's injuries. Consequently, Plaintiff's claims against Nurse Robinson fail as a matter of law.

---

[6]     Notably, there is no evidence in Plaintiff's medical record that a nurse made any statements to Plaintiff about the type of treatment Nurse Robinson should have provided.

**B.      Plaintiff's skin condition has been litigated before and has been continuously treated.**

Assuming Plaintiff's skin condition is, for constitutional purposes, a serious medical need, Plaintiff still cannot show deliberate indifference to it, because Plaintiff's skin conditions were continuously treated. Plaintiff knows that continuous treatment of his skin conditions bars a claim for deliberate indifference. *See Pinkston v. Miss. Dept. of Corrections, et al.*, NO. 4:17-CV-39-DMB-DAS, 2018 WL 357947, at *8-9 (N.D. Miss. July 25, 2018) (finding no deliberate indifference where Plaintiff's skin conditions were regularly treated at Miss. State Penitentiary). In *Pinkston*, Plaintiff sued Centurion, Dr. Hendrik Kuiper, and Nurse Leatha Barron complaining, among other things, that Plaintiff's eczema and psoriasis were being treated insufficiently, causing his skin conditions to worsen and remain untreated at the Mississippi State Penitentiary. *Id.* at *1, 8. The court found Plaintiff's dry skin conditions were continually treated, and that Plaintiff was "merely unhappy with the treatment provided." *Id.* at *9. On July 25, 2018, the court entered thus summary judgment on this claim for all defendants. *Id.* Two months later, Plaintiff filed this lawsuit, again hauling Centurion and its providers into court about Plaintiff's skin conditions.

Plaintiff, despite his pauper status, is not entitled to avoid the ordinary rules of *res judicata*. *Pittman v. Moore*, 980 F.2d 994, 994 (5th Cir. 1993). Plaintiff therefore cannot relitigate a claim raised in *Pinkston* if (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by final judgment on the merits; and (4) the same claim or cause of action was involved in both actions. *Petro-Hunt, LLC v. United States*, 365 F.3d 385, 395 (5th Cir. 2004).

Here, Plaintiff has yet again sued Centurion and its providers. *See Owens v. Mason*, NO. 3-18-CV-200-DPJ-FKB, 2018 WL 6580509, at *2 (S.D. Miss. Dec. 13, 2018) (finding defendants named in only second suit in privity with defendant in first where all were affiliated with Hinds

County); *Brown v. Byrd*, NO. 1:15-cv-105-HSO-JCG, 2016 WL 11476944, at *3 (S.D. Miss. June 22, 2016) (finding medical providers in second suit in privy with those in first where all worked for same medical company).  And Plaintiff again has sued about his skin condition, contending it's treated insufficiently.  *See Brown*, 2016 WL 11476944, at *3 (finding both suits arose from same nucleus of operative facts because both challenged the adequacy of the same medical treatment). Plaintiff's last attempt to litigate the treatment of his skin condition resulted in summary judgment for the Centurion defendants by a court of competent jurisdiction.  *See Pinkston*, 2018 WL 357947, at *8-9.  Thus, the Court should find Plaintiff's skin-condition claim to be barred, *Brown*, 2016 WL 11476944, at *3, and malicious, *Bailey v. Johnson*, 846 F.2d 1019 (5th Cir. 2010) (finding second suit "repeat[ing] the same factual allegations that [the plaintiff] asserted in his earlier case" to be malicious, "although he successively sued different defendants" in the second suit); *Barclay v. Lowe*, 131 F. App'x 778 (2d Cir. 2005) (finding suits were duplicative because they concerned the same claims and all defendants in both suits were employees of the same prison).

Estoppel and malice aside, Plaintiff's skin-condition claim still fails.  For Plaintiff's medical records, as in *Pinkston*, reveal continued treatment for Plaintiff's skin condition.  *See generally*, Ex. B.  Indeed, Plaintiff's prescription for his medicated lotion was refilled upon his arrival at WCCF.  *Id.* at Pinkston v Centurion 000121.  A sample of Plaintiff's skin was sent to an offsite dermatologist for a biopsy, and the dermatologist ultimately prescribed more ointments and lotions as the course of treatment.  *Id.* at Pinkston v Centurion 000078.  And finally, Plaintiff saw an offsite dermatologist, who prescribed more ointments and lotions as the course of treatment. *Id.* at Pinkston v Centurion 000173.

This continued treatment of Plaintiff's skin conditions defeats Plaintiff's deliberate indifference claim.  *See Williams v. Epps*, Nos. 3:13CV256–MPM–DAS, 4:13CV241–MPM–

DAS, 2014 WL 4250490, at *2 (N.D. Miss. Aug. 27, 2014) (finding inmate failed to state a 1983 claim where his skin condition was continuously but unsuccessfully treated); *see also Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (holding that "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut inmates' allegations of deliberate indifference.").  This is true even if the treatment did not reap ideal results.  *See, e.g.*, *Williams v. Chief of Medical Operations, Tarrant County Jail*, 44 F.3d 1004, 1004 (5th Cir. 1994) (noting continued pain despite ongoing treatment did not create a constitutional violation); *Smith v. Woodall*, No. 1:14cv294–HSO–RHW, 2015 WL 9808777, at *3 (S.D. Miss. Oct. 28, 2015) ("Unsuccessful treatment . . . do[es] not give rise to a § 1983 cause of action.").  And it is not enough that this treatment was not of the specific type or timing Plaintiff desired.  *See Mendoza*, 989 F.2d at 193 (noting disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); *Webb v. Ford*, No. 2:09CV187-MTP, 2010 WL 3239438, at *4 (S.D. Miss. Aug. 13, 2010) (noting inmates have "no automatic constitutional right to an outside referral or specialist.").

As in *Pinkston*, Plaintiff received continuous treatment for his skin condition.  Nonetheless, Plaintiff is once again upset with the nature of that treatment.  And based on that frustration, Plaintiff has once again hauled his medical providers into court.  But once again, Plaintiff's claims must fail.

### C.  Plaintiff cannot complain of Medical Service Requests that he did not submit.

Plaintiff's medical records show Plaintiff submitted his first Medical Service Request form at WCCF on May 10, 2018, complaining about his hand being slammed in his tray flap.  *Id*. at Pinkston v Centurion 000229.  Prior to this, Plaintiff merely complained to his mental health provider about his medical concerns.  *See* Ex. B at Pinkston v Centurion 000123.  Plaintiff cannot

succeed on his claim of delayed or denied medical care if he did not actually submit his complaints through the appropriate process. *See, e.g.*, *Kelly v. Mgmt. and Training Corp.*, No. 5:16-cv-104(DCB)(MTP), 2017 WL 4284598, *2 (S.D. Miss. Sept. 27, 2017) ("a prisoner cannot fulfill the exhaustion requirement through general allegations that he notified prison officials of a violation; rather, he must follow the process set forth by the prison.").

Even if Plaintiff submitted Medical Service Requests, he has not shown that any delayed response to them has caused him any harm. This failure dooms his claim. *See Mendoza*, 989 F.2d at 195 (noting delay in medical care "can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm."). Indeed, when Plaintiff was seen by a provider for his hand injury, after submitting a Medical Service Request, he informed the nurse treating him that the problem had resolved.

Finally, the extent Plaintiff is asserting a claim based on delayed responses to _other_ inmates' Medical Service Requests, he cannot. "A party must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Constitutional rights are personal in nature; each person must assert their own and cannot rest a claim on those of another. *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). It has been repeatedly held, by this Court and others, that prisoners cannot maintain a complaint on behalf of their fellow inmates. *See Crawford v. Morales*, 8 F.3d 20, at *3 (5th Cir. 1993) (per curiam); *Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986); *Anderson v. Jackson County*, No. 1:11–cv–67–HSO–JMR, 2011 WL 4708032, at *2 (S.D. Miss. Oct. 4, 2011); *Hye v. Broadus*, No. 1:08–cv–220–HSO–JMR, 2009 WL 3259130, at *14 (S.D. Miss. Oct. 8, 2009). Consequently, "[a] [p]laintiff has no standing to bring an action pursuant to 42 U.S.C. § 1983 on behalf of" other WCCF inmates who are dissatisfied with the handling of their Medical Service Requests. *Anderson*, 2011 WL 4708032,

at *2; *see also Holton v. MTC*, No. 3:17CV485-RHW, 2018 WL 2424427, at *2 (S.D. Miss. May 29, 2018) (finding Plaintiff lacked standing to bring Section 1983 based on alleged failure of Centurion to provide constitutionally adequate medical care to other inmate).

### III.   Plaintiff cannot connect HSA Reed or Meggs, in their supervisory roles, to the alleged deliberate indifference.

Even if deliberate indifference could be found, Plaintiff cannot connect his injuries, Meggs, or HSA Reed to it.  It is well-settled that Section 1983 does not 'create supervisory or respondeat superior liability.' "  *Burris v. Davis*, 642 F. Supp. 573, 578 (S.D. Miss. 2009) (quoting *Oliver v. Scott*, 276 F.3d 736, 742 & n. 6 (5th Cir. 2002)).  Instead, "supervisory prison officials may be held liable for a Section 1983 violation only if they either were personally involved in the constitutional deprivation or if there is a 'sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' "  *Bullock v. SMCI Medical Dept.*, 2009 WL 2407737, at *2 (S.D. Miss. Aug. 3, 2009) (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)).

Neither Meggs, Centurion's Vice President of Operations, nor HSA Reed was Plaintiff's treating physician during the pertinent time period.  And Plaintiff has not alleged—much less shown—that either Meggs or HSA Reed actually denied Plaintiff any medical treatment or ignored any sick calls.  Instead, Plaintiff contends they are responsible by virtue of their being "in charge" of approving offsite services at WCCF.[7]  This is not enough for Section 1983 liability.  *See Stewart v. Murphy*, 174 F.3d 530, 536 (5th Cir. 1999)) (dismissing inmate's claims against the medical director of the Miss. State Penitentiary since he was not the inmate's treating physician and had limited contact with him); *Ramsey v. Management Training & Corp.*, NO. 4:18-CV-00178-RP,

---

[7]     This contention is inaccurate.  The contract between Centurion and MDOC requires that approval for scheduling of off-site specialty care referrals be at the discretion of the MDOC Specialty Care Coordinator.  *See* Ex. C at ¶4.

2019 WL 5191825, at *2 (N.D. Miss. Oct. 15, 2019) (finding 1983 claim fail as matter of law because inmate failed to demonstrate defendants had any personal involvement or were causally connected to the alleged denial of medical care); *Phillips v. Monroe County*, 143 F. Supp. 2d 663, 668 (N.D. Miss. 2001) (dismissing inmate's claims against Mississippi State Penitentiary's medical director since he had no contact with the inmate).

Even if this requisite causal connection were found, it is still missing the link between the alleged medical deliberate indifference and Plaintiff's harm.   "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm."  *Mendoza*, 989 F.2d at 195; *see also Purtell v. Corrections Corp. of America*, No. 2:05CV192-MPM-JAD, 2007 WL 1464376, at *2 (N.D. Miss. March 26, 2007) (noting inmates must allege more than *de minimus* injury to bring suit).  Plaintiff has neither alleged nor shown that the failure to send to him to an offsite dermatologist earlier in his treatment caused his skin condition to worsen to the extent of "substantial harm."

### IV.   Centurion is not liable for its employees' alleged conduct.

"Section 1983 does not create supervisory or respondeat superior liability." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002); *see also Powell v. Shopco Laurel Co.*, 678 F.2d 504, 505–506 (4th Cir. 1982) (finding that the plaintiff could not recover against a private state-employed company under § 1983 based on respondeat superior).  Rather, "Fifth Circuit precedent requires either personal involvement by an individual Defendant in the alleged violation, or the enforcement of some policy or practice resulting in the constitutional deprivation." *Reed v. Mgmt. and Training Corp.*, NO. 3:14CV452-LRA, 2016 WL 1050739, at *3 (S.D. Miss. March 16, 2016) (citing *Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th Cir. 1999)).

Plaintiff has established neither.  As explained above, no individual Centurion Defendant violated Plaintiff's constitutional rights.  *See White v. Wexford Health Sources, Inc.*, No. 3:10–CV–612–TS–MTP, 2013 WL 962365, at *5 (S.D. Miss. Feb. 11, 2013) (noting employer cannot be liable if no underlying constitutional violation).  But even if a constitutional violation had occurred, liability still would not attach because Plaintiff does not claim—and the evidence does not show—that Centurion was personally involved in the alleged violations.

Likewise, Plaintiff has not shown some policy or practice caused a constitutional deprivation.  Again, no underlying constitutional violation has occurred.  Nonetheless, Plaintiff has not alleged—or supported—any of the three essential policy/practice elements:

(1) the presence of a policymaker who could be held responsible, through actual or constructive knowledge, for enforcing a policy or custom that caused the claimed injury;

(2) an official custom or policy which could subject it to § 1983 liability; and

(3) a claimant must demonstrate that the corporate action was taken with the requisite degree of culpability, and show a direct causal link between the action and the deprivation of federal rights.

*Olivas v. Corr. Corp. of Am.*, 408 F. Supp. 2d 251, 255 (N.D. Tex. 2006), aff'd, 215 F. App'x 332 (5th Cir. 2007).  Thus, Plaintiff's claims against Centurion must fail.

## Conclusion

This case is entirely based on Plaintiff's unsubstantiated ideas about the medical treatment he should receive.  But Plaintiff's idealized medical standard is not the applicable standard.  Rather, this Court must determine whether the Centurion Defendants were deliberately indifferent to Plaintiff's serious medical needs.  They were not.  Nurse Robinson treated Plaintiff's May 15, 2018 injuries.  And Dr. Burke has treated Plaintiff's skin condition continuously since Plaintiff arrived at WCCF.  Plaintiff merely disagrees with the nature, timing, and extent of these efforts.

But that is not enough to state a Section 1983 claim.  Consequently, the Centurion Defendants are entitled to summary judgment on all of Plaintiff's claims against them.

Respectfully submitted, November 15, 2019.

/s/Stevie F. Rushing
Michael J. Bentley (MSB# 102631)
Molly M. Walker (MSB# 100689)
Stevie F. Rushing (MSB# 105534)
mbentley@bradley.com
mmwalker@bradley.com
srushing@bradley.com

**Attorney for the Centurion Defendants**

OF COUNSEL
Bradley Arant Boult Cummings, LLP
One Jackson Place
188 East Capitol Street, Suite 1000
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and mailed via U.S. Mail, postage prepaid to:

Chaz D. Pinkston, #148934
Wilkinson County Correctional Facility
Unit: H.J.K H-Pod Cell #108
P.O. Box 1889
Woodville, MS 39669

*Pro Se Plaintiff*

/s/ Stevie F. Rushing
OF COUNSEL