**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

CHAZ D. PINKSTON                                                                        PLAINTIFF

v.                                                                   CIVIL ACTION NO. 5:18-cv-103-MTP

PELICIA HALL, ET AL.                                                                   DEFENDANTS

<u>OPINION AND ORDER</u>

THIS MATTER is before the Court on the Motion for Summary Judgment [183] filed by

Defendants Trinity Services Group, Inc. and Delvittia Davis; the Motion for a Temporary

Restraining Order and Preliminary Injunction [213] filed by Plaintiff; the Motion for Summary

Judgment [216] filed by Defendants Centurion of Mississippi, LLC, Eshunna Robinson, April

Meggs, Nathaniel Reed, and Dr. James Burke; the Motion for Summary Judgment [223] filed by

Defendants Pelicia Hall, Jerry Williams, Roger Davis, Richard Pennington, Tony Compton,

Gloria Perry, Mike Hatten, Chandra Berryman, and Larry Lee; the Motion for Summary

Judgment [227] filed by Defendants Management & Training Corporation ("MTC"), Jody

Bradley, Karen Brown, Briana Chester, Terry Daniel, Bryan Gaston, Justin Green, John Gueho,

Chandra Hughey, Michael Johnson, Jacob Jones, Robert Marquardt, Bessie McKnight, Tonya

Toomey, Gabriel Walker, Robyn Williams, and Delando Miles; and the Motion to Strike [280]

filed by Defendants Trinity Services Group, Inc. and Delvittia Davis.

**BACKGROUND**

On October 1, 2018, Plaintiff Chaz Pinkston, proceeding *pro se* and *in forma pauperis*,

filed this civil action pursuant to 42 U.S.C. § 1983.  The allegations in Plaintiff's complaint

occurred while he was incarcerated as a post-conviction inmate at the Wilkinson County

Correctional Facility ("WCCF").  Plaintiff's claims were clarified and amended by his testimony at the *Spears*[1] hearing.

Plaintiff arrived at WCCF in January of 2018 and was housed in the maximum-security unit. According to Plaintiff, on May 5, 2018, he requested a cup of water, and Defendant Michael Johnson brought him a cup of water.  As Johnson talked to another individual, Plaintiff allegedly witnessed spittle from Johnson's mouth land in his cup of water.  Plaintiff refused to drink the water.  Allegedly, Johnson attempted to take the cup from Plaintiff's hand and then shut the cell door's tray flap on Plaintiff's hand, which resulted in his hand being numb for two or three days.

On May 10, 2018, Johnson allegedly ordered other correctional officers not to feed Plaintiff that day.  Around 5:00 or 6:00 p.m. that day, Johnson opened Plaintiff's tray flap.  According to Plaintiff, he reached his hand out of the tray flap, and Johnson shut the flap on Plaintiff's hand, which scraped some skin off his hand and caused numbness for a couple of days.

According to Plaintiff, on May 15, 2018, Defendants Michael King and Briana Chester were escorting Plaintiff to the law library when he began complaining that his restraints were too tight.  Defendant Johnson allegedly forced his fingers under the restraints and said they were not too tight.  Then, Defendant Bryan Gaston arrived and allegedly forced his fingers under the restraints.  Thereafter, Plaintiff refused to walk.  Johnson and Gaston allegedly picked Plaintiff up by his restraints.  According to Plaintiff, Captain Scott (non-defendant) arrived and instructed Johnson and Gaston to drop Plaintiff.  Defendants Terry Daniels and Tonya Toomey allegedly witnessed these events and did not stop Johnson and Gaston.

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

Once Plaintiff was escorted back to his housing unit, Johnson allegedly slammed Plaintiff's head against the wall, causing a large bump on his head and swelling around his eye. Defendant King allegedly witnessed Johnson's actions.

Thereafter, Defendant Nurse Eshunna Robinson treated Plaintiff in the hall.  According to Plaintiff, Nurse Robinson checked his temperature and blood pressure, but failed to examine his wrists, ankles, or the bump on his head.  Later, another nurse documented cuts on Plaintiff's wrists and ankles and swelling around his eye.  Allegedly, this nurse stated that Plaintiff should have received a cold pack.  Plaintiff claims that he got an infection in his eye two weeks later.

On July 9, 2018, Plaintiff's cell flooded when another inmate broke the sprinkler in the cell above Plaintiff's.  Plaintiff allegedly asked Defendants Justin Green and John Gueho for a mat and dry clothing, but they refused.  According to Plaintiff, he did not receive new clothing or other supplies for multiple days.

Plaintiff also alleges that on July 11, 2018, Defendant Green allegedly ordered other correctional officers not to provide Plaintiff food. Following Green's instructions, Defendants Chandra Hughey and Jacob Jones allegedly instructed another correctional officer (Bailey) not to provide Plaintiff food.  Plaintiff alleges that, although he received breakfast each day, he did not receive lunch or dinner for approximately five days.

On July 16, 2018, while Defendants Daniels and Green were near Plaintiff's cell, Plaintiff asked Defendants if he could speak to prison officials concerning the conditions at the prison. Allegedly, Daniels told Green he could do "whatever," and Green sprayed Plaintiff with pepper spray, closed his tray flap, and did not take him to the medical unit.

Additionally, Plaintiff alleges that he has eczema and psoriasis.  According to Plaintiff, he has submitted several sick calls concerning his skin conditions, but has not received responses

or sufficient treatment.  Plaintiff claims that Defendants Dr. James Burke and Nathaniel Reed (Health Administrator) submitted a request to have Plaintiff seen by a dermatologist, but Defendants April Meggs (Director of Nursing), Mike Hatten (MDOC Medical Administrator), and Gloria Perry (MDOC Medical Director) refused this request.[2]  Plaintiff alleges that Dr. Burke and Reed failed to take additional steps to treat his skin conditions.  Plaintiff, however, admits that he was seen concerning his skin conditions three or four times in 2018 and three times in 2019, that he has been provided skin creams and ointments (although he claims they were ineffective), and that he has been to a dermatologist on two occasions since he filed this action.

Plaintiff also alleges that during his incarceration, he was consistently served spoiled food and served an inadequate amount of food (approximately 1,000 calories a day).  Plaintiff alleges that Defendant Delvittia Davis, as the Nutritional Supervisor, had a duty to provide fresh food and appropriate amounts of food.  Plaintiff alleges that Davis refused to replace food items which were unfit.  Plaintiff claims Defendant Trinity Services Group, Inc., as the food service contractor, had a duty to oversee the distribution of food and ensure the appropriate amount of fresh food was served.  According to Plaintiff, the food has gotten better in 2019, but it is not satisfactory.  Plaintiff alleges he experienced weight loss and diarrhea as a result of the spoiled and inadequate food.

Plaintiff asserts that Defendant Green knew about the inadequate food but failed to rectify the situation.  According to Plaintiff, he sent letters concerning the food to Defendants Roger Davis (MDOC Food Services Director), Robert Marquardt (President of MTC), Pelicia Hall (MDOC Commissioner), Jerry Williams (MDOC Deputy Commissioner), Tony Compton

---

[2] Plaintiff alleges that he had no contact with Defendants Meggs, Hatten, or Perry.

(MDOC Contractor Administrator), Chandra Berryman (MDOC Contract Director), Larry Lee (MDOC Contract Monitor), and Robyn Williams (MTC Official).

Plaintiff also claims that he was denied recreation.  According to Plaintiff, the maximum-security unit was on "lockdown" for most of 2018, and during those periods, he was in his cell 24 hours a day, with no recreation, visitation, or religious services.  Plaintiff claims that Defendants Walker, Toomey, Bradley, Lee, R. Williams, Hall, and Daniels are responsible for the lack of recreation.

Plaintiff also complains about the cleanliness of his cell.  Plaintiff alleges that his cell is never cleaned and that there is dried blood, feces, and mildew on the walls.  Plaintiff also alleges that there is mold on the air vents[3] and that the prison has spiders, gnats, and ants.  Plaintiff claims that Defendants MTC, Marquardt, R. Williams, Bradley, Walker, Toomey, Daniels, Green, Brown, Gueho, Miles, and McKnight are responsible for the conditions in his cell.

Additionally, Plaintiff claims that he is a Jehovah's Witness and that Defendant Bradley would not allow him to receive religious literature or allow other Jehovah's Witnesses to come and study with him.  Plaintiff also alleges that Bradley would only show the inmates religious videos of Bradley's choosing.

Finally, Plaintiff asserts a claim against Defendant Richard Pennington, the MDOC ARP Director, concerning the ARP process.  Plaintiff alleges that when he submits ARP grievances, he either receives denials or no response at all.  Plaintiff also alleges that there are significant delays in the ARP process and that officials do not adhere to the ARP policies.[4]

---

[3] Plaintiff does not know if the mold is harmful, but he alleges that it affects his sinuses.

[4] Plaintiff also asserted claims concerning the denial of adequate medical care against Defendants Gaston and Daniels and asserted claims concerning the issuance of clothes against

As relief for his claims, Plaintiff seeks compensatory and punitive damages.

## STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgement will be granted when "the record indicates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). The Court is not permitted to make credibility determinations or weigh the evidence. *See Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2001)). When deciding whether a genuine issue of fact exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010).

However, the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner*, 476 F.3d at 343 (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In the absence of proof, the Court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted). The nonmovant cannot survive a proper motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir. 1988); *see also Celotex*, 477 U.S. at 325-26. Instead,

---

several Defendants.  The Court, however, dismissed those claims for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). *See* Order [151].

the nonmovant must present evidence sufficient to support a resolution of the factual issues in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### Denial of Adequate Medical Care

As previously mentioned, Plaintiff claims that Defendant Nurse Robinson failed to adequately treat his injuries on May 15, 2018 and claims that Defendants Dr. Burke, Reed, Meggs, Hatten, and Perry failed to adequately treat his skin conditions. Plaintiff's allegations regarding his medical care amount to claims against these Defendants for violations of the Eighth Amendment. "Prison officials violate the constitutional proscription against cruel and unusual punishment when they are deliberately indifferent to a prisoner's serious medical needs, as doing so constitutes unnecessary and wanton infliction of pain." *Davidson v. Texas Dep't of Criminal Justice*, 91 Fed. App'x 963, 964 (5th Cir. 2004) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Deliberate indifference "is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A plaintiff must show that a defendant's "response indicate[d] that the [defendant] subjectively intended that harm occur." *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th Cir. 2001).

An official is not deliberately indifferent unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 838. Plaintiff must "submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical

needs.'" *Davidson*, 91 Fed. App'x at 965 (quoting *Domino*, 239 F.3d at 756). "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 333-34 (1986). Plaintiff is not entitled to the "best" medical treatment available. *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978); *Irby v. Cole*, 2006 WL 2827551, at *7 (S.D. Miss. Sept. 25, 2006). Further, a prisoner's "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 2001).

On November 15, 2019, Defendants Centurion of Mississippi, LLC ("Centurion"), Nurse Robinson, Meggs, Reed and Dr. Burke filed a Motion for Summary Judgment [216]. On November 22, 2019, Defendants Hatten and Perry (along with other Defendants) filed a Motion for Summary Judgment [223]. In support of their Motions for Summary Judgment, Defendants submitted, *inter alia*, Plaintiff's medical records and an affidavit from Dr. Burke.

Treatment on May 15, 2018

Plaintiff alleges that Nurse Robinson failed to adequately treat his injuries on May 15, 2018. According to Plaintiff, Nurse Robinson checked his temperature and blood pressure, but failed to treat the cuts on his wrists and ankles caused by restraints and failed to treat the bump on his head. According to Plaintiff, Nurse Robinson should have provided him a cold pack. Plaintiff claims that as a result of the inadequate care, he got an infection in his eye two weeks later.

Plaintiff's medical records demonstrate that a week after his encounter with Nurse Robinson, on May 22, 2018, another nurse examined Plaintiff after he complained of pain in his hand. *See* Medical Records [219] at 59-60.  At that time, the nurse noted that the issue of pain in Plaintiff's hand had resolved. *Id*.  That same day, Dr. Burke examined Plaintiff and noted a hemorrhage in Plaintiff's eye and a small hematoma on his right brow. *Id*. at 58.  Dr. Burke, however, noted that there was no evidence of a facial fracture and no injuries to Plaintiff's hands. *Id*.  Dr. Burke provided Plaintiff artificial tears and ibuprofen. *Id*.

In response to the Motions for Summary Judgment, Plaintiff asserts that there are no medical records showing that Nurse Robinson treated him on May 15, 2018 and asserts that Nurse Robinson did not provide him any treatment on that day. *See* [276] at 5; [279] at 5. Plaintiff's assertion that Nurse Robinson did not provide any treatment is contradicted by Plaintiff's own testimony stating that Nurse Robinson checked his blood pressure and his temperature. *See* [216-1] at 32.

Additionally, an official only acts with deliberate indifference when she knows of and disregards an *excessive* risk to an inmate's health. *See Farmer*, 511 U.S. at 838.  The record does not establish that Nurse Robinson knew of an excessive risk to Plaintiff's health.  The injuries he complains of were "cuts" on his wrists and ankles which were healed within a week and a bump on his head which a doctor treated with ibuprofen and artificial tears. *See* [219] at 58.  There is no evidence that Plaintiff was suffering from an infection at the time Dr. Burke provided him treatment on May 22, 2018, and there is no evidence that Nurse Robinson's failure to provide Plaintiff a cold pack or any other treatment caused or worsened Plaintiff's injuries.  Accordingly, Nurse Eshunna Robinson is entitled to judgment as a matter of law.

<u>Skin Conditions</u>

Plaintiff brings claims against Defendants Centurion, Meggs, Reed, Dr. Burke, Hatten, and Perry concerning the treatment of his skin conditions.  In their Motion for Summary Judgment [216], Defendants Centurion, Meggs, Reed, and Dr. Burke first argue that Plaintiff failed to exhaust his administrative remedies prior to filing this action.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. § 1983. "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).  The United States Court of Appeals for the Fifth Circuit held that "[s]ince exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272.  Because exhaustion is an affirmative defense, Defendants bear the burden of demonstrating that Plaintiff failed to exhaust available administrative remedies. *Id*. at 266.

The Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement. *Johnson v. Ford*, 261 Fed. App'x 752, 755 (5th Cir. 2008) (citing *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)).  A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary."  *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006).  It is not enough to merely initiate the grievance process or to put prison officials on notice of a complaint; the grievance process must be carried through to its conclusion. *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

Mississippi Code § 47-5-801 grants the Mississippi Department of Corrections ("MDOC") the authority to adopt an administrative review procedure at each of its correctional facilities.  Pursuant to this statutory authority, the MDOC has set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a complaint relating to any aspect of his incarceration. *See* MISSISSIPPI DEPARTMENT OF CORRECTIONS HANDBOOK[5] at Ch. VIII.

The ARP is a two-step process.  An inmate is required to submit his initial grievance or request, in writing, through the Inmate Legal Assistance Program ("ILAP") within thirty days of an alleged incident.  If, after screening, the grievance or request is accepted into the ARP, an official will issue a First Step Response.  If the inmate is unsatisfied with the First Step Response, he may continue to the Second Step by using ARP form ARP-2. *See* MISSISSIPPI DEPARTMENT OF CORRECTIONS HANDBOOK at Ch. VIII.

In support of their Motion for Summary Judgment [216], Defendants submitted documents relating to Plaintiff's grievances.  The record shows that on April 2, 2018, Plaintiff submitted an ARP grievance, complaining about the "conditions of confinement" in the maximum-security unit. *See* Grievance [216-4] at 3.  Plaintiff mentions Dr. Burke, but he does not mention the treatment of his skin conditions.  Defendants argue that they were not given fair notice of any complaint regarding the treatment of his skin conditions.

Indeed, Plaintiff's grievance did not provide notice to Defendants that Plaintiff had a complaint against them concerning the inadequate treatment of skin conditions. The Fifth Circuit has held that grievances should provide prison officials fair notice of an inmate's specific

---

[5] *See* http://www.mdoc.ms.gov/Inmate-Info/Pages/Inmate-Handbook.aspx. (Last visited May 8, 2020).

complaints and the "time and opportunity to address [the] complaints internally." *Johnson v.
Johnson*, 385 F.3d 503, 516 (5th Cir. 2004).  "Thus, a grievance should be considered sufficient
to the extent that the grievance gives officials a fair opportunity to address the problem that will
later form the basis of the lawsuit." *Id.* at 517.  The degree of specificity required in a grievance
is determined by each prison's own protocol.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).

The inmate handbook directs inmates to "present as many facts as possible to answer all
the questions: who, what, when, where, and how concerning the incident."  *See* MISSISSIPPI
DEPARTMENT OF CORRECTIONS HANDBOOK at Ch. VIII.  Plaintiff's complaint concerning the
"conditions of confinement" simply did not provide prison officials fair notice of a complaint
concerning the treatment of his skin conditions.  One of the principal purposes of the
administrative exhaustion requirement is to provide fair notice to prison officials of an inmate's
specific complaints so as to provide "time and opportunity to address complaints internally."
*Johnson*, 385 F.3d at 517.  The record establishes that Plaintiff failed to exhaust his
administrative remedies prior to filing this action.

Moreover, Plaintiff has failed to demonstrate that Defendants were deliberately
indifferent to his serious medical needs.  Plaintiff's medical records demonstrate that on or about
January 24, 2018, Plaintiff was transferred to WCCF from the Mississippi State Penitentiary,
where it was noted that Plaintiff had been malingering. *See* [219] at 92.[6]  On January 28, 2019,
Plaintiff was examined by a mental health professional, and was scheduled to be examined by a

---

[6] On March 24, 2017, Plaintiff filed an action against Centurion and others in the United States
District Court for the Northern District of Mississippi concerning the treatment of his skin
conditions at the Mississippi State Penitentiary.  On July 25, 2018—a little more than two
months before Plaintiff filed this action—that court dismissed Plaintiff's claims, holding that
"the uncontroverted summary judgment evidence demonstrates merely that Pinkston has a
chronic skin condition and was unhappy with the prescribed treatment options." *See Pinkston v.
MDOC*, 2018 WL 3579473, at *9 (N.D. Miss. July 25, 2018).

medical professional on January 30, 2018. *Id.* at 88-90.  The mental health professional would later note that Plaintiff is "preoccupied with battles with staff" and has a history of "enjoying legal battles" with staff.  *Id.* at 49; 78-79.

On January 29, 2018, Plaintiffs prescriptions for Prednisone and Lubrisoft (a type of lotion) were refilled. *Id.* at 87.[7]  Plaintiff's appointment with a medical professional was rescheduled multiple times due to "lockdowns" and him not being transported to the medical unit by correctional officers. *Id.* at 75-86.  On April 24, 2018, Dr. Burke examined Plaintiff and noted eczema on his legs and tinea on his face. *Id.* at 66-68.  Dr. Burke prescribed Plaintiff betamethasone ointment for the eczema and benzoyl peroxide gel and clotrimazole for the tinea. *Id.*

On July 3, 2018, Dr. Burke examined Plaintiff.  Dr. Burke noted that he had raised, scaly plaques without redness and noted that he had experienced issues with this for two years. *Id.* at 53.  A biopsy of Plaintiff's skin had been performed while he was housed at the Mississippi State Penitentiary, revealing a "infundibual cyst." *Id.* at 53; Affidavit [216-3] at 2.  Dr. Burke found this to be a "non-specific finding" and determined that a dermatology consultation should occur. *See* [219] at 53.

On September 17, 2018, Dr. Burke collected a specimen from Plaintiff's leg to be biopsied. *Id.* at 45-46.  Dr. Burke sent the biopsy results, photographs, and notes regarding previous treatments to a dermatologist via RubiconMD, an online medical consultation service. *Id.* at 41; [216-3] at 2-3.  On October 2, 2018, Dr. Burke examined Plaintiff and removed the

---

[7] In his Response [276], Plaintiff asserts that he did not receive any medications until after April 27, 2018. *See* [276] at 6.

sutures from his leg. *See* [219] at 41.  Dr. Burke explained to Plaintiff that he would consult with the dermatologist and offer a treatment plan. *Id*.

The dermatologist determined that Plaintiff possibly has ichthyosis vulgaris,[8] a genetic disorder, and noted that medical professionals "may not get rid of it completely" *Id*. at 35.  The dermatologist recommended aggressive moisturization, suggesting the use of Aquaphor ointment or Vaseline and the use of a mild urea cream or Cerave SA cream. *Id*.  On October 16, 2018, Dr. Burke met with Plaintiff to explain the dermatologist's findings, but Plaintiff "was not interested in listening" and demanded to see an outside dermatologist. *Id*.  On October 22, 2018, Dr. Burke prescribed the treatment suggested by the dermatologist. *Id*. at 33-34.

On November 7, 2018, Dr. Burke examined Plaintiff after he again requested an appointment with an outside dermatologist. *Id*. at 26.  Dr. Burke explained to Plaintiff that the medications he received were suggested by a dermatologist and explained that his condition was likely hereditary and could not be cured. *Id*. 26-27.

On January 17, 2020, Dr. Jeremy Rawson examined Plaintiff and noted that he has a psoriatic skin condition and dermatitis which are resistant to therapy. *Id*. at 12.  Dr. Rawson added triamcinolone acetonide and A & D Ointment to Plaintiff's treatment and requested another dermatology consultation. *Id*.

On February 6, 2019, Plaintiff was taken to the University of Mississippi Medical Center where he was treated by a dermatologist. *Id*. at 6.  The dermatologist diagnosed Plaintiff with eczema and keratosis pilaris, a harmless skin condition that causes dry, rough patches and tiny

---

[8] Ichthyosis vulgaris is a genetic skin disorder in which dead skin cells accumulate in thick, dry scales. *See* https://www.mayoclinic.org/diseases-conditions/ichthyosis-vulgaris/symptoms-causes/syc-20373754 (last visited May 8, 2020).

bumps.[9] *Id.* at 96.  The dermatologist explained to Plaintiff the chronic and recurrent nature of his condition and prescribed him CeraVe cream, Lac Hydrin lotion, and triamcinolone cream. *Id.*

The evidence does not demonstrate that the actions or inactions of Defendants prevented Plaintiff from receiving adequate medical care.  Plaintiff has failed to come forward with evidence demonstrating that Defendants knew of and disregarded an excessive risk to his health or that Defendants' actions caused his injuries.  The record demonstrates that Plaintiff's condition was assessed, monitored, and treated.  Plaintiff was provided multiple medications, and his condition was assessed by multiple outside dermatologists.  Plaintiff has failed to make a showing that Defendants "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Davidson*, 91 Fed. App'x at 965 (quoting *Domino*, 239 F.3d at 756); *see also Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (holding that "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").  Additionally, Plaintiff has not shown that any delay in medical care resulted in "substantial harm." *See Mendoza*, 989 F.2d at 195.  Plaintiff is not entitled to the "best" medical treatment available, and "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *McMahon*, 583 F.2d at 174; *Norton*, 122 F.3d at 292.

Because Plaintiff received constitutionally adequate medical treatment, Plaintiff's claims against Defendants Centurion, Meggs, Reed, Dr. Burke, Hatten, and Perry are without merit, and these Defendants are entitled to judgment as a matter of law.

---

[9] *See* https://www.mayoclinic.org/diseases-conditions/keratosis-pilaris/symptoms-causes/syc-20351149 (last visited May 8, 2020).

Plaintiff also filed a Motion to Temporary Restraining Order and Preliminary Injunction [213] requesting that the Court order Defendants to provide him additional medical care concerning his skin conditions.  As the Court has found that Plaintiff has failed to come forward with specific facts showing that there is a genuine issue for trial and the Defendants are entitled to judgment as a matter of law, the Court will deny Plaintiff's Motion [213].[10]

### Excessive Force

Plaintiff alleges that excessive force was used against him on May 5, 2018; May 10, 2018; May 15, 2018; and July 16, 2018.  Plaintiff asserts excessive force claims against Defendants Johnson, King, Chester, Gaston, Daniels, Toomey, and Green. When prison officials are accused of using excessive force in violation of the Eighth Amendment, "the *core judicial inquiry* is . . . whether force was applied in a *good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm*." *Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).  The Eighth Amendment's "prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Copeland v. Nunan*, 250 F.3d 743, 2001 WL 274738, at *2 (5th Cir. Feb. 21, 2001) (quoting *Hudson*, 503 U.S. at 2) (internal quotations and citations

---

[10] In order to establish that he is entitled to an injunction, Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction will cause to the adverse party; and (4) that the injunction will not have an adverse effect on the public interest.  These requirements are not balanced.  Instead, each one must be met before the Court can provide relief.  "An injunction is an extraordinary remedy and should not issue except upon a clear showing of possible irreparable injury." *Mississippi Power & Light Co. V. United Gas Pipeline Co.*, 760 F.2d 618 (5th Cir. 1985); *Women's Med. Ctr. Of NW Houston v. Bell*, 248 F.3d 411, 419 (5th 2001); *Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976).  Plaintiff has failed to make this showing.

omitted).  In determining whether excessive force was applied, courts consider several factors, including: "(1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response." *Baldwin*, 137 F.3d at 838-39 (internal citations omitted).

On November 27, 2019, Defendants Johnson, Chester, Gaston, Daniels, Toomey, and Green (along with other Defendants) filed a Motion for Summary Judgment [227].  In support of their Motion for Summary Judgment, Defendants submitted, *inter alia*, declarations from Defendants Johnson and Green, incident reports, video footage, and excerpts from Plaintiff's medical records.

July 16, 2018

As there is video footage of the encounter, the Court will begin its analysis with the July 16, 2018 incident involving Plaintiff and Defendants Daniels and Green.  Plaintiff alleges that he asked Daniels and Green if he could speak to prison officials concerning the conditions at the prison.  Allegedly, Daniels told Green to do "whatever," and Green sprayed Plaintiff with pepper spray, closed the tray flap, and did not take him to the medical unit.

The record, however, demonstrates that Defendant Green administered pepper spray only after Plaintiff refused multiple orders from Defendant.  In support of their Motion for Summary Judgment [227], Defendants submitted a declaration from Green and a video of the incident as issue. *See* [227-6]; [227-7]; [235].  In his declaration, Green states that officers notified him that after Plaintiff was escorted from recreation back to his cell, Plaintiff refused to give up his handcuffs. *See* [227-6] at 3.  Additionally, the video begins with Green explaining that Plaintiff has removed his handcuffs and refused to give them to officers.

17

In the video, Green approaches Plaintiff's cell and orders him to give up the handcuffs. Green repeats this order multiple times and warns Plaintiff that a chemical agent[11] will be used, but Plaintiff refuses. Thereafter, Green opens Plaintiff's tray flap and administers a short burst of pepper spray. Another officer removes a towel which was blocking the tray opening, and Green administers a second short burst of pepper spray. Again, Green gives Plaintiff multiple orders to give up the handcuffs. Plaintiff refuses. Green administers two more short bursts of pepper spray and again orders Plaintiff to give up the handcuffs. Finally, Plaintiff complies. Thereafter, Green retrieves a nurse and Plaintiff washes himself in his sink. *See* [227-7]; [235].

In his Response, Plaintiff argues that he did not refuse to give up the handcuffs but was trying to explain that he has a right to speak with "administrative authority." *See* [266] at 9. Plaintiff also argues that the use of force violated MDOC policy. *Id*. at 10. As the videos shows, Green gave Plaintiff several clear orders to give up the handcuffs, and Plaintiff failed to comply with those orders. Additionally, violations of prison policy and procedure, without more, do not rise to the level of a constitutional deprivation. *See Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

The record, including the video of the incident, reveals no evidence whatsoever of excessive force. Based on the record, the Court finds that Defendant's force was applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm.[12] As demonstrated by the video, Plaintiff's excessive force claim concerning the July 16,

---

[11] Green refers to the chemical agent as "OC spray."
[12] *See White v. Collins*, 2008 WL 2779443 (S.D. Miss. July 14, 2008); *McDowel v. Wilkinson Cty. Corr. Facility*, 2008 WL 5169632 (S.D. Miss. Dec. 3, 2008); *Ward v. Shaw*, 2015 WL 5712812 (S.D. Miss. Sept. 29, 2015).

2018 incident is frivolous, and Defendants are entitled to a judgment as a matter of law on this claim.

<u>May 5, 2018 and May 10, 2018</u>

Plaintiff alleges that on two separate occasions, on May 5, 2018 and May 10, 2018, Defendant Johnson shut a cell door's tray flap on Plaintiff's hand.  In his declaration, Johnson states that prison policy mandates that tray flaps remain closed when not opened for feeding, medication administration, or other necessary purposes. *See* Declaration [227-3].  According to Johnson, Plaintiff routinely resisted efforts by staff to close his tray flap. *Id*.  Johnson states that on one occasion, the date of which he cannot recall, he was attempting to close Plaintiff's tray flap when Plaintiff "suddenly ran up to the cell door and slid his hand through the flap to prevent it from being closed." *Id*.  According to Johnson, the tray flap struck Plaintiff's hand due to his own resistant behavior. *Id*.

Indeed, the record demonstrates that Plaintiff interfered with Johnson's attempts to perform his duties.  Plaintiff's own testimony demonstrates that he attempted to prevent Johnson from closing the tray flap.  Concerning the May 5, 2018 incident, Plaintiff testified as follows:

> You know, so instead he end[ed] up snatching the cup from my hand, but he actually twisted my hand, you know, and it broke the back of the cup.  And so then he ended up throwing the . . . the water on the floor and he slammed the tray slot down on my hand, because he was trying to close the tray slot.  But he still had my cup anyway.  **I'm like, no, you're not fixing to close my tray slot**, and he slammed my hand and he got my cup.

*See* Transcript [227-1] at 22.  Additionally, Plaintiff's testimony concerning the May 10, 2018 incident reveals that Plaintiff attempted to reach through the tray slot to grab a meal tray from Johnson. *Id*. at 25-26.

In his Response [266], Plaintiff states that Johnson beat, twisted, and smashed his hand.[13] The record, however, demonstrates that Plaintiff did not suffer any serious injuries to his hands. Plaintiff testified that after the May 5, 2018 incident, some of his fingers were numb for a few days and that the May 10, 2018 incident resulted in a scrape on the back of his hand and some numbness. *Id*. at 23-25.  Plaintiff even admitted there were no serious injuries. *Id*. at 25.  This is confirmed by Plaintiff's medical records.  On May 22, 2018, a doctor examined Plaintiff and noted there were no injuries to his hands. *See* [219] at 59-60.

The record, including Plaintiff's own testimony, demonstrates that Defendant Johnson's force was applied in a good faith effort to maintain discipline and not maliciously and sadistically to cause harm. *See Balwin*, 137 F.3d at 838.  Accordingly, the Court finds that Defendant Johnson is entitled to judgment as a matter of law concerning the claims arising from the May 5, 2018 and May 10, 2018 incidents.

May 15, 2018

Plaintiff alleges that on May 15, 2018, Defendants King and Chester were escorting Plaintiff to the law library when he began complaining that his restraints were too tight. Defendant Johnson allegedly forced his fingers under the restraints and said they were not too tight.  Defendant Gaston arrived and allegedly forced his fingers under the restraints.  Thereafter, Plaintiff refused to walk.  Johnson and Gaston allegedly picked Plaintiff up by his restraints. According to Plaintiff, Captain Scott (non-defendant) arrived and instructed Johnson and Gaston

---

[13] Plaintiff also alleges for the first time in his Response [266] that Johnson promised to have him assaulted by other prisoners.  However, mere allegations of verbal abuse or threats do not present actionable claims under Section 1983. *See McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) (internal quotation and citation omitted); *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002).

to drop Plaintiff.  Daniels and Toomey allegedly witnessed these events and did not stop Johnson

and Gaston.

Once Plaintiff was escorted back to his housing unit, Johnson allegedly slammed

Plaintiff's head against the wall, causing a large bump on his head and swelling around his eye.

King allegedly witnessed Johnson's actions.

> Concerning the use of restraints, Johnson states the following in his declaration:
>
> Officer Chester and I were escorting Pinkston from the law library when he became
> very aggressive, complaining that his leg restraints were too tight and demanding
> that they be loosened or removed.  Lt. Gaston was called for assistance.  When Lt.
> Gaston checked Pinkston's restraints, his fingers could be placed between the
> restraints and Pinkston's leg, which indicated the restraints were not too tight.  At
> that point, Pinkston refused to continue to walk, as staff had ordered him to do.
> Staff then picked Pinkston up by holding him under his arms and started to carry
> him down the hallway.

*See* [227-3] at 2.  Defendants also submitted multiple incident reports indicating that Gaston

informed Plaintiff that his restraints were not too tight and that Plaintiff disregarded orders and

acted aggressively. *See* Incident Reports [227-4].

In response, Plaintiff argues that it was unreasonable for Johnson and Gaston to try to

push their "fat fingers" under his restraints. *See* [269] at 11.  The Eighth Amendment's

prohibition against cruel and unusual punishment is implicated when restraints are used to

subject a prisoner to "great pain" either "deliberately, as punishment, or mindlessly, with

indifference to the prisoner's humanity." *Fulford v. King*, 692 F.2d 11, 14-15 (5th Cir. 1982).

However, simply placing handcuffs on a prisoner or detainee too tightly, without more, does not

amount to excessive force. *See Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

As previously mentioned, the Court should consider the need for the force used when

determining whether the force was excessive.  The record, including Plaintiff's own allegation,

demonstrate that, after Plaintiff complained about the restraints, both Johnson and Gaston used

their fingers to check the restraints.  Additionally, the record demonstrates that Johnson and Gaston only carried Plaintiff after he refused to walk.

The Court should also consider the extent of Plaintiff's injuries. *See Baldwin*, 137 F.3d at 838-39; *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (finding that long-term nerve damage can support an excessive force claim); *Weatherly v. Wade*, 2009 WL 513982, at *5 (S.D. Tex. Mar. 2, 2009) ("the hand restraints were tight enough to cause superficial bruising and abrasions to plaintiff's wrists but were not so tight that they caused a physical injury to the bones, soft tissue or nerves in plaintiff's hands or wrists").  In his Response, Plaintiff describes the injuries to his wrists and ankles as "deep gashes." *See* [266] at 4.  Following the incident, however, a nurse examined Plaintiff and noted swelling on Plaintiff's head but did not note any injuries to Plaintiff's wrists or ankles. *See* [227-4] at 11.  A week after the incident, on May 22, 2018, another nurse and a doctor examined Plaintiff and did not note any injuries to Plaintiff's wrists or ankles. *See* [219] at 59-60.

Considering the relevant factors, this incident was "not the type of egregious punishment that shocks the conscience of mankind or otherwise invokes the protections of the Eighth Amendment." *See Jones v. Taylor*, 2015 WL 5793721, at *10 (S.D. Tex. Oct. 1, 2015).  At most, the evidence suggests that Defendants were negligent when they applied Plaintiffs' restraints, determined whether they were too tight, and carried Plaintiff down the hall after he was non-compliant.  Accordingly, the Court finds that Defendants are entitled to judgment as a matter of law concerning the claims arising from the use of restraints on May 15, 2018.

Plaintiff also alleges that Johnson slammed his head against the wall.  In his declaration, Johnson states as follows:

> Pinkston agreed to walk and was placed on his feet.  Pinkston walked toward the housing unit on his own power but became aggressive, yelling at me as we

proceeded down the hallway.  Once we reached H-Pod, Pinkston became even more aggressive than he had before.  Pinkston pulled away and said he was going to get out of his cuffs and show us what he could do.  In response to Pinkston's aggressive behavior, Major Daniel ordered me and Officer King to place Pinkston on the wall so that we could regain control of the situation, which we did.  Major Daniel then removed Pinkston's restraints.  Pinkston was then placed in his cell, and medical staff was notified.

*See* [227-3] at 2-3.

Plaintiff and Johnson present different versions of this event.  Plaintiff alleges that Defendants rammed him against the wall, and then, Johnson placed "his hand on the back of my neck and head (he put it on the joint connection) and proceeded to bang my face up against the brick wall." *See* [266] at 4.

However, even accepting Plaintiff's version of events as true, Plaintiff has failed to demonstrate a genuine issue as to any material fact.  Johnson's declaration and the incident reports submitted by Defendants indicate that Plaintiff was acting aggressively toward Defendants and resisting their efforts to escort him to his housing unit.  Johnson even states Plaintiff pulled away from the officers and threatened them.  Plaintiff admits that Defendants instructed him to stop resisting.  According to Plaintiff, Daniels stated, "keep talking and resisting and we're going to put you on the floor instead." *See* [266] at 4.

Plaintiff does not allege, nor does the evidence demonstrate, that he stopped resisting and was compliant prior to the Defendants' use of force.  Instead, Plaintiff simply states that Defendants' actions were "unnecessary" and "unprovoked." *See* [269] at 12.  Such conclusory allegations cannot defeat summary judgment. *See Gabarrete v. Hazel*, 2012 WL 1966023, at *3 (E.D. Cal. May 31, 2012) (dismissing complaint which included the "conclusory allegation that the . . . assault was unprovoked and unnecessary due to his being under mechanical restraints and

23

escorted by numerous corrections staff"); *Tribblet v. Sanchez*, 1996 WL 296581, at *2 (N.D. Ill. May 31, 1996) (finding that allegation of "unnecessary force" was far too vague and conclusory).

Plaintiff argues that the "key factor" to consider is that he was "fully restrained" during this incident. *See* [269] at 11.  Officers, however, are not prohibited from using necessary force on a prisoner wearing restraints when the prisoner continues to resist. *See Hill v. Carroll Cty., Miss.*, 467 F. Supp. 2d 696, 704 (N.D. Miss. 2006), aff'd, 587 F.3d 230 (5th Cir. 2009) (holding that officers' conduct was reasonable when they "hog-tied" arrestee because she continued to resist after her hands were cuffed behind her back and her legs were cuffed together); *Griggs v. Brewer*, 841 F.3d 308, 315-16 (5th Cir. 2016) (holding that officer's conduct was reasonable when he punched an arrestee, who was handcuffed, after the arrestee kicked the officer in the chest).  Thus, Plaintiff's actions, specifically his resistance to Defendants, must be considered even though he was wearing restraints.

Additionally, courts consider the extent of the injury suffered in determining whether excessive force was applied, and the evidence concerning Plaintiff's injuries supports summary judgment.  On the day of the incident, a nurse noted swelling on Plaintiff's head. *See* [227-4] at 11.  A week later, Dr. Burke examined Plaintiff and noted a hemorrhage in Plaintiff's eye and a small hematoma on his right brow. *See* [219] at 58.  Dr. Burke, however, noted that there was no evidence of a facial fracture and provided Plaintiff artificial tears and ibuprofen. *Id*.

The record demonstrates that Defendants' force was applied in a good faith effort to maintain discipline and not maliciously and sadistically to cause harm. *See Balwin*, 137 F.3d at 838; *Miles v. Murra*, 2006 WL 456269, at *3-4 (S.D. Tex. Feb. 23, 2006) (finding that a correctional officer used pepper spray, a chokehold, and his knee in an inmate's back to restore order and discipline after the inmate refused his commands); *Jackson v. Hochberg*, 2015 WL

1219253, at *3 (N.D. Miss. Mar. 17, 2015) ("given the mayhem which occurred here, correctional officers and administrators had not just an option, but a duty to quell the outbreak of violence . . . ."); *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) ("nothing about the use of chemical spray or even a choke-hold was objectively unreasonable conduct where the suspect physically resisted arrest"); *Poole v. Russell*, 2016 WL 6082041, at *6-7 (W.D. La. Oct. 18, 2016) (finding that a plaintiff's resistance to arrest made a police officer's decision to pin the plaintiff to the floor with his knee objectively reasonable).

Plaintiff also claims that Defendants Gaston, Daniels, King, Chester, and Toomey failed to intervene during Johnson's use of excessive force. An officer who is present and does not take reasonable measures to protect an inmate from another officer's use of excessive force may be liable under § 1983. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995); *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir.1993). However, an officer must have had a reasonable opportunity to realize the excessive nature of the force and a realistic opportunity to stop it in order for the duty to intervene to arise. *Id.* However, "[i]n order for bystander liability to exist, there must be an underlying use of excessive force." *Zantiz v. Seal*, 2013 WL 6834369, at *6 (E.D. La. Dec. 26, 2013) (citing *Elliot v. Linnell*, 269 Fed. App'x. 450, 451 (5th Cir. 2008)); *see also Harmon v. Nguyen*, 2016 WL 750923, at *4 (N.D. Tex. Feb. 4, 2016) (citing *Peavy v. Dallas Indep. Sch. Dist.*, 57 F. Supp. 2d 382, 390 n.4 (N.D. Tex. 1999)). Because Johnson did not use excessive force, Plaintiff's claim against the other Defendants fails. Moreover, the record demonstrates that these Defendants did not have a realistic opportunity to stop the force applied by Johnson. Accordingly, the Court finds that Defendants are entitled to judgment as a matter of law concerning the claims arising from the use of force on May 15, 2018.

The record reveals that Defendant King has not been served, has not entered an appearance in this action, and did not move for summary judgment.  However, the defenses raised by Defendants in their Motion for Summary Judgment [227] inure to the benefit of King. Because the arguments in the Motion for Summary Judgment [227] apply equally to King and the claims raised against him, the Court's judgment should apply equally to King. *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (allowing defaulting defendants to to benefit for the moving defendants' favorable motion for summary judgment); *Blake v. McCormick*, 2007 WL 1671732, at *5 (S.D. Tex. June 8 2007) (holding that the affirmative defense raised by the defendants in their motions for summary judgment "inures to the benefit of any unserved or defaulting defendants"); *Spoon v. City of Galveston, TX*, 2018 WL 6246693, at *1 (S.D. Tex. Nov. 29, 2018); *Bernal Lara v. Toro Bronco Corp.*, 2016 WL 4401256, at *5 (W.D. Tex. Mar. 14, 2016); *Oliver v. Sollie*, 2011 WL 3684667, at *3 (S.D. Miss. Aug. 22, 2011).

Moreover, Defendant King may be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m).  In his Complaint [1], Plaintiff named correctional officer "King" as a Defendant.  On March 8, 2019, counsel for MTC identified officer "King" as "Robert King" and informed the Court that he is no longer employed by MTC. *See* Sealed Response [48].  Counsel also provided the last known address for Defendant King.  Service of King, however, was unsuccessful because he did not live at the address provided. *See* Return [90].

On September 4, 2019 Plaintiff filed a Motion to Amend Complaint [168] asserting that officer King is named "Michael King."  Defendants did not oppose the Motion [168] and asserted that "Robert King" goes by the name "Michael King." *See* Response [170].  Defendants also asserted that they previously provided the last known address for Michael King. *Id*.  On October 18, 2019, the Court allowed the amendment and directed the United States Marshal to

serve Michael King at the last known address provided by Defendants. *See* Order [186].  The Court also directed Plaintiff to provide an address where Michael King may be served. *Id*.

The Marshal was unable to serve King because he did not live at the address provided by Defendants. *See* Return [222].  Additionally, Plaintiff has failed to provide an address where Michael King may be served. *See* Response [231].  Fed. R. Civ. P. 4(m) provides: "If a defendant is not served within 90 days after the complaint is filed, the court–on motion or on its own after notice to the plaintiff–must dismiss the action without prejudice against that defendant or order that service be made within a specific time."  In addition, special rules govern the procedure for service of process in cases filed by plaintiffs proceeding *in forma pauperis*. *Lindsey v. U.S. R.R. Ret. Bd.*, 101 F.3d 444, 446 (5th Cir. 1996).  Pursuant to 28 U.S.C. § 1915(c), "the officers of the court shall issue and serve all process, and perform all duties in [*in forma pauperis*] cases." *See also* Fed. R. Civ. P. 4(c)(3) ("At the plaintiff's request, the court may order that service be made by a United States marshal . . . .  The court must so order if the plaintiff is authorized to proceed *in forma pauperis* under 28 U.S.C. § 1915 . . .").  Thus, "[o]nce the *in forma pauperis* plaintiff has taken steps to identify the defendant(s), 'the court is obligated to issue plaintiff's process to a United States Marshal who must in turn effectuate service upon the defendants.'" *Lindsey*, 101 F.3d at 446 (citation omitted).  However, if the plaintiff is made aware of possible defects in service of process, he must attempt to remedy them. *Verrette v. Majors*, 2008 WL 4793197, at *2 (W.D. La. Oct. 31, 2008) (*citing Rochon v. Dawson*, 828 F.2d 1107, 1110 (5th Cir. 1987)).

In this case, the Court on multiple occasions directed the United States Marshal to serve Defendant King at the address provided by Defendants and directed Plaintiff to provide an address for Defendant King.  The 90-day deadline for service expired long ago and this case has

been pending for over nineteen months, yet Defendant King has not been served with process.

Thus, even if Plaintiff's claims against King were not dismissed with prejudice based on the

merits, King would be dismissed without prejudice Fed. R. Civ. P. 4(m).

### Conditions of Confinement

Plaintiff asserts multiple claims arising from the conditions of his confinement.  The

Defendants filed Motions for Summary Judgment [183] [223] [227] addressing Plaintiff's

conditions-of-confinement claims.  The Eighth Amendment protects inmates from cruel and

unusual punishment and "requires prison officials to provide 'humane conditions of

confinement,' ensuring that 'inmates receive adequate food, clothing, shelter, and medical

care….'" *Palmer v. Johnson*, 193 F.3d 346, 351-52 (5th Cir. 1999) (quoting *Farmer v. Brennan*,

511 U.S. 825, 932 (1994)). In order to demonstrate that prison officials violated the Eighth

Amendment, Plaintiff must establish that the official was deliberately indifferent to a substantial

risk of serious harm. *Id*. Deliberate indifference "is an extremely high standard to meet." *Gobert*

*v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). The test for establishing deliberate indifference

is "one of subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 837.

Not all unpleasant conditions of confinement amount to cruel and unusual punishment.

"To the extent such conditions are restrictive and even harsh, they are part of the penalty that

criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337,

347 (1981). "[T]he Constitution does not mandate comfortable prisons, and prisons…cannot be

free of discomfort." *Id*. at 349. Only those conditions which are "inhuman and barbaric" and

deny an inmate of "the minimal measure of life's necessities" violate the Eighth Amendment.

*Palmer*, 193 F.3d at 352.

<u>Flooded Cell</u>

According to Plaintiff, his cell flooded on July 9, 2018, and Defendants Green and Gueho refused to provide him a mat and dry clothing.  Plaintiff alleges that he did not receive new clothing or other supplies for multiple days.  In his Response, Plaintiff elaborated on his claims by alleging that he was unable to lie down for thirty-six hours, that he was not provided a sheet and blanket until two days after the flood, and that he was not provided towels, clothing and a mat until six days after the flood. *See* [266] at 7.

The conditions alleged by Plaintiff exposed him to some unpleasantness and discomfort but were not so egregious as to rise to the level of cruel and unusual punishment. *See Krause v. Leonard*, 352 Fed. App'x. 933, 396 n.10 (5th Cir. 2009).  Only extreme deprivations can be characterized as punishment prohibited by the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1992).  The United States Court of Appeals for the Fifth Circuit has stated that the length of time spent in offensive conditions should be taken into account, because a "filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months." *Alexander v. Tippah Cty.*, 351 F.3d 626, 631 (5th Cir. 2003); *see also Smith v. Copeland*, 87 F.3d 265, 267 (8th Cir. 1996) (four days of exposure to an overflowed toilet did not rise to the level of a constitutional violation); *Housley v. Harrison Cty.*, 2015 WL 5577063, at *3 (S.D. Miss. Sept. 22, 2015) (three days of exposure to feces and vomit did not rise to the level of a constitutional violation); *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (placement in cell without clothes, running water, mattress, pillow, or blanket for four days was not unconstitutional); *Hamilton v. Lyons*, 74 F.3d 99, 106 n.8 (5th Cir. 1996) (the denial of showers and clean clothes for a short period of time does not constitute cruel and unusual punishment).

Plaintiff's allegations describe a "relatively short period" of annoyance and discomfort, not the deprivation of "the minimal measure of life's necessities." *See Palmer*, 193 F.3d at 352.

Accordingly, the Court finds that Defendants are entitled to judgment as a matter of law concerning the claims arising from the flooding of his cell on July 9, 2018.

Cleanliness of Cell

Plaintiff also complains about more persistent issues. Plaintiff alleges that his cell is never cleaned and that there is dried blood, feces, and mildew on the walls. Plaintiff also alleges that there is mold on the air vents and that the prison has spiders, gnats, and ants. Plaintiff claims that Defendants MTC, Marquardt, R. Williams, Bradley, Walker, Toomey, Daniels, Green, Brown, Gueho, Miles, and McKnight are responsible for the conditions in his cell.

In support of their Motion for Summary Judgment [227], Defendants submitted a declaration from Justin Green stating that prisoners are "provided with cleaning supplies on a regular basis to keep their cells in sanitary condition." *See* [227-6] at 2. Plaintiff, however, denies this assertion and states that he was never provided cleaning supplies. *See* [266] at 12. Plaintiff also states that his cell has not been clean in over two years. *Id.*

At the summary judgment stage, the Court is not permitted to make credibility determination or weight the evidence. *See Deville*, 567 F.3d at 164. Viewing the facts in the light most favorable to Plaintiff, there are genuine disputes as to material fact regarding the conditions of Plaintiff's cell. Not all unpleasant conditions of confinement amount to cruel and unusual punishment, but "[o]bviously, there is a point beyond which a prison's conditions are so unsanitary as to render the unconstitutional." *Luke v. Beagron*, 2016 WL 8740486, at *6 (E.D. La. Dec. 28, 2016). A "filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months." *Alexander*, 351 F.3d at 631. Accepting Plaintiff's

allegations as true, he has been in a filthy cell with vermin and dried blood, feces, and mildew covering the walls for two years and has not been given an opportunity to clean his cell.

In *McCord v. Maggio*, the Fifth Circuit found a constitutional violation where a prisoner was forced, for a ten-month period, to sleep on a wet mattress "in filthy water contaminated with human waste." 927 F.2d 844, 848 (5th Cir. 1991). In *Gates v. Cook*, the Fifth Circuit found a constitutional violation where prisoners lived in cells covered with "crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles." 376 F. 3d 323, 338 (5th Cir. 2004).[14] The court found that "[l]iving in such conditions would present a substantial risk of serious harm to the inmates." *Id*. The conditions alleged by Plaintiff are like those in *Gates*, and Plaintiff alleges that he has been exposed to these conditions for more than two years without the means to clean his cell.

The Court finds that there is a genuine factual dispute over whether the conditions of Plaintiff's cell exposed him to a substantial risk of serious harm and denied him the minimal civilized measure of life's necessities. Accordingly, the Court will deny the Motion for Summary Judgment [227] to the extent Defendants seek a dismissal of Plaintiff's claims concerning the cleanliness of his cell. This claim against Defendants MTC, Marquardt, R. Williams, Bradley, Walker, Toomey, Daniels, Green, Brown, Gueho, Miles, and McKnight shall continue.[15]

---

[14] In *Gates*, the court cited to *Howard v. Adkinson*, 887 F.2d 134, 137 (8th Cir. 1989), in which the Eighth Circuit held that a prisoner being placed in a cell covered with filth and human waste for a two-year period without proper cleaning supplies constitutes cruel and unusual punishment.

[15] Although this claim survives summary judgment, it is not clear to what extent each of these Defendants are responsible for the alleged conditions of Plaintiff's cell. Neither the Motion for Summary Judgment nor Plaintiff's Response addressed each defendant's participation in the alleged wrong.

Deprivation of Food

Plaintiff alleges that Defendant Johnson deprived him of food for a single day—May 10, 2018.  Additionally, Plaintiff alleges that from July 11, 2018 to July 16, 2018, Defendants Green, Hughey, and Jones deprived him of lunch and dinner.  Plaintiff admits that he received breakfast each of these days and that he received lunch on July 12, 2018. *See* Order [146]; Response [266] at 7.

The Constitution requires that inmates be provided "'well-balanced meal[s], containing sufficient nutritional value to preserve health.'" *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986) (quoting *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977)); *see also Eason v. Thaler*, 73 F.3d 1322, 1327 (5th Cir. 1996) ("To comply with the Constitution, inmates must receive 'reasonably adequate' food.").  "The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities." *Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir. 1998) (internal quotations and citation omitted). "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation." *Id.*

In support of their Motion for Summary Judgment [227], Defendants cite to Justin Green's declaration which states that WCCF has the following policy for delivering meal trays to inmates in long-term segregation:

> If an inmate is threatening staff or throwing things through the flap, he is instructed to move to the back of his cell so that his meal tray can be placed through the flap onto the floor.  If he refuses to do so, the tray flap is secured until he is willing to exhibit compliant behavior.  In the meantime, the inmate's meal tray is placed on a ledge near his cell in the housing unit so that it can later be provided to him if [he] ultimately chooses to comply.

*See* [227-6] at 1.

According to Green, officers withheld meal trays from Plaintiff only when he was threatening staff or when he failed to comply with the security protocol for the delivery of meal trays. *Id*. at 1-2. Green states that Plaintiff's "failure to receive his meal tray at the designated time was the sole result of his own aggressive behavior and his refusal to comply with security protocols and orders given to him by staff." *Id*. at 2.[16] Citing *Talib*,[17] Defendants argue that they are entitled to summary judgment because it was Plaintiff's own refusal to comply with a reasonable restriction which resulted in the denial of food.

In response, Plaintiff asserts that he has never thrown anything from his cell and has never threatened to harm anyone. *See* [266] at 11. Plaintiff points out that there is no video footage of him throwing objects from his cell. He also points out that he did not receive any rule violation reports indicating he committed such acts or indicating that his meals were being withheld due to his behavior. Plaintiff, however, does not specifically refute Green's testimony that Plaintiff failed to comply with the security protocol for the delivery of meal trays, which required him to stay to the back of his cell while his meal was placed on the floor. Instead, Plaintiff argues that the security protocol is "made up," senseless, and not supported by any written policy. *See* [269] at 26. Plaintiff also argues that written policy precludes the use of food as a disciplinary measure. *Id*. at 24.

However, violations of prison policy and procedure, without more, do not rise to the level of a constitutional deprivation. *See Hernandez*, 788 F.2d at 1158; *Myers*, 97 F.3d at 94. The request that an inmate move to the back of his cell while his meal tray is being delivered is

---

[16] Defendant Johnson also states in his declaration that Plaintiff did not receive meal trays only when he refused them or due to his behavior. *See* [227-3] at 2.

[17] *See Talib*, 138 F.3d at 216 ("Given the ease with which Talib could have complied with reasonable prison regulations, he in a very real sense carried the keys to the kitchen cupboard.") (internal quotations and citation omitted).

reasonable, and it did not violate Plaintiff's constitutional rights to deny him a meal tray on a few occasions when he did not comply with the requests.

Moreover, Plaintiff's allegation that he was not served food on May 10, 2018 and then not served lunch and dinner (but was served breakfast) from July 11, 2018 to July 16, 2018, does not rise to the level of a constitutional violation. *See McClure v. Texas Dep't of Crim. Justice Corr. Dep't*, 459 Fed. App'x. 348, 351 (5th Cir. 2012); *see also Talib*, 138 F.3d at 214 n.3 (expressing doubt that a prisoner who missed fifty meals in five months, or one out of every nine meals, and lost fifteen pounds established a constitutional violation); *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (holding that the denial of eight meals over a seven month period, during which the plaintiff experienced only hunger pains, but no other discomfort or injury, did not rise to the level of serious deprivation); *Lockamy v. Rodriguez*, 402 Fed. Appx. 950, 951 (5th Cir. 2010) (plaintiff did not suffer physical injury from being deprived of every meal over a 54-hour period).  Accordingly, the Court finds that Defendants are entitled to judgment as a matter of law concerning the claims arising from the deprivation of food on May 10, 2018 and July 11, 2018 through July 16, 2018.

Adequacy of Food

Plaintiff also alleges that the he was consistently served spoiled food and served an inadequate amount of food.  Plaintiff alleges that Defendants Davis and Trinity Services Group, Inc. had a duty to ensure that he was provided adequate food and appropriate amounts of food. Plaintiff asserts that Defendant Green was aware of the inadequate food.  Plaintiff also asserts that he sent letters concerning the food to Defendants R. Davis, Marquardt, Hall, R. Williams, Compton, Berryman, Lee, and J. Williams.  As previously explained, inmates must receive

reasonably adequate food constituting the minimal civilized measure of life's necessities. *Eason*,

73 F.3d at 1327; *Talib*, 138 F.3d at 214 n. 3.

On October 15, 2019, Defendants Davis and Trinity Services Group, Inc. filed a Motion

for Summary Judgment [183].  On November 22, 2019, Defendants Roger Davis, Hall,

Compton, Berryman, Lee, and J. Williams filed a Motion for Summary Judgment [223].  On

November 27, 2019, Defendants Green, Marquardt, and R. Williams filed a Motion for Summary

Judgment [227].  In their Motion for Summary Judgment [227], Defendants Green, Marquardt,

and R. Williams argue that Plaintiff failed to exhaust his administrative remedies prior to filing

this action.

As discussed supra pp. 10-11, the PLRA, 42 U.S.C. § 1997e(a), requires prisoners to

exhaust any available administrative remedies prior to filing suit under 42 U.S.C. § 1983.  At

WCCF, the ARP is a two-step process.  On August 28, 2018, Plaintiff submitted his initial

grievance complaining about the adequacy of the food provided at WCCF. *See* [227-11] at 3-5.

Plaintiff filed this lawsuit on October 1, 2018, prior to receiving a response to his grievance.  On

December 11, 2018, Plaintiff received a first-step response. *Id*. at 7.  Plaintiff appealed to the

second step, and on December 28, 2018, Warden Bradley completed a second-step response. *Id*.

at 12.

The record demonstrates that Plaintiff failed to exhaust before filing this action.  Plaintiff,

however, argues that he was not required to exhaust before filing this action because there was a

delay in providing him a response. *See* [269] at 28.  Defendants explain that there was a delay

because Plaintiff already had other grievances pending when the subject grievance was filed, and

as a result, the grievance was "backlogged" until the pending grievances were resolved. *See*

[278] at 10.  Indeed, on October 16, 2018, Plaintiff received a letter explaining that the subject

grievance would not be considered until his then-pending grievances were resolved or

withdrawn. *See* [227-11] at 6.

"Exhaustion is no longer left to the discretion of the district court, but it is mandatory."

*Woodford*, 548 U.S. at 85.  The grievance process must be completed *prior* to filing suit in

federal court.  The Fifth Circuit has stated as follows:

> District courts have no discretion to excuse a prisoner's failure to properly exhaust
> the prison grievance process before filing their complaint.  It is irrelevant whether
> exhaustion is achieved during the federal proceeding.  Pre-filing exhaustion is
> mandatory, and the case must be dismissed if available administrative remedies
> were not exhausted.

*Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

A policy of "backlogging" does not abrogate the PLRA's exhaustion requirement. *Wilson*

*v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015).  The Fifth Circuit has explained as follows:

> This requirement does not fall by the wayside in the event that the prison fails to
> respond to the prisoner's grievance at some preliminary step in the grievance
> process.  Instead, the prison's failure to timely respond simply entitles the prisoner
> to move on to the next step in the process  Thus, it is only if the prison fails to
> respond at the *last* step of the grievance process that the prisoner becomes entitled
> to sue, because then there is no next step (save filing a lawsuit) to which the prisoner
> can advance.

*Id*.

One of the principal purposes of the administrative exhaustion requirement is to provide

fair notice to prison officials of an inmate's specific complaints so as to provide "time and

opportunity to address complaints internally." *Johnson*, 385 F.3d at 517.  The record establishes

that Plaintiff failed to exhaust his administrative remedies concerning his claim about the

adequacy of the food.  Accordingly, Plaintiff may not proceed with this claim against Defendants

Green, Marquardt, and R. Williams.  Although Defendants Davis and Trinity Services Group,

Inc. did not raise the issue of exhaustion in their Motion for Summary Judgment [183], this

defense inures to the benefit of these Defendants because they raised it as an affirmative defense in their Answer [162]. *See Howard v. Epps*, 2013 WL 2367880, at *4 n.4 (S.D. Miss. May 29, 2013); *Oliver*, 2011 WL 3684667, at *3.

Defendants Roger Davis, Hall, Compton, Berryman, Lee, and J. Williams did not raise exhaustion as an affirmative defense in their Answer [67]; thus, the Court will consider the merits of Plaintiff's claims against them.  As previously mentioned, Plaintiff alleges that he sent letters concerning the food to these Defendants.

It is well-settled that § 1983 does not "create supervisory or *respondeat superior* liability." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).  "To state a cause of action under § 1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant." *Jolly v. Klien*, 923 F. Supp. 931, 943 (S.D. Tex. 1996) (citing *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992)).  Thus, supervisory prison officials may be liable for a § 1983 violation only if they either were personally involved in the constitutional deprivation or if there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Plaintiff has not shown that R. Davis, Hall, Compton, Berryman, Lee, and J. Williams were personally involved in a constitutional deprivation.  The "mere failure to investigate or respond correctly to an inmate's written administrative complaints is not a basis for liability under § 1983.  To the contrary, there is no constitutional right to an investigation or to a favorable response in reply to an administrative grievance and there is no due process right inherent in such a claim." *Campbell v. Cain*, 2016 WL 828786, at *4 (M.D. La. Feb. 11, 2016) (citing *Mahogany v. Miller*, 252 Fed. App'x 593, 595 (5th Cir. 2007)).  "The fact Plaintiff wrote

letters to the warden and his family and friends made telephone calls which were not returned does not demonstrate personal involvement by the warden in any alleged constitutional violations." *Ray v. Wilson*, 2017 WL 9806929, at *4 (E.D. Tex. Oct. 17, 2017); *see also Hunt v. Barry Telford Unit*, 2017 WL 9285374, at *3 (E.D. Tex. Jan. 3, 2017).

In his Response [258], Plaintiff asserts that these Defendants failed to properly supervise and train Defendants Davis and Trinity Services Group, Inc. Plaintiff first raised this claim in response to a summary judgment motion, and the Court finds that Plaintiff should not be granted leave to amend his complaint to assert this claim. However, even if the Court were to allow the amendment, the claim lacks merit.[18]

The Defendants also argue that they are entitled to summary judgment on any claims against them in their official capacity because such claims are barred by sovereign immunity. The Eleventh Amendment "generally precludes actions against state officers in the official capacities." *Salinas v. Tex. Workforce Comm'n*, 573 Fed. App'x 370, 372 (5th Cir. 2014). This is because "a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). To the extent Plaintiff has asserted any claims against these Defendants in their official capacity, they

---

[18] To succeed on a failure to train or supervise claim, a plaintiff must show "(1) the supervisor either failed to supervise or train the subordinate official; (2) a casual link exists between the failure to train or supervise and violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375 at 381 (5th Cir. 2005) (quotations and citations omitted). Generally, "[a] plaintiff must demonstrate at least a pattern of similar violations arising from training or supervising that is so clearly inadequate as to be obviously likely to result in a constitutional violation." *E.A.F.F. v. U.S.*, 955 F. Supp. 2d 707, 745 (W.D. Tex. 2013). Plaintiff has failed to present anything other than conclusory allegations against these Defendants regarding inadequate supervision and training.

are barred by the Eleventh Amendment.[19]  The Court finds that Defendants R. Davis, Hall, Compton, Berryman, Lee, and J. Williams are entitled to judgment as a matter of law concerning all claims arising from the adequacy of the food at WCCF.

Lack of Recreation

Plaintiff claims that he was denied adequate recreation time.  According to Plaintiff, the maximum-security unit was on "lockdown" for most of 2018, and during those periods, he was in his cell 24 hours a day, with no recreation, visitation, or religious services.  Plaintiff claims that Defendants Walker, Toomey, Bradley, Lee, R. Williams, Hall, and Daniels are responsible for the lack of recreation.  First, a prisoner "has no constitutional right to visitation privileges," and any claim arising from the denial of visitation should be dismissed. *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999).  Second, the Fifth Circuit has held that neither prisoners nor pretrial detainees have a *per se* constitutional right to outdoor exercise or recreation. *See Callicut v. Panola County Jail*, 200 F.3d 816, 1999 WL 1095663 at *3 (5th Cir. 1999); *Jones v. Diamond*, 594 F.2d 997, 1013 (5th Cir. 1979).  Prison conditions may be "restrictive and even harsh" without violating an inmate's Eighth Amendment rights. *See Rhodes v. Chapman*, 452 U.S. 337, 447 (1981).  For the denial of recreation to violate the Eighth Amendment, Plaintiff must show: "(1) that prison officials failed to provide him with adequate exercise opportunities; and (2) that prison officials acted with deliberate indifference to a substantial risk of harm to his health and safety." *Lewis v. Smith*, 277 F.3d 1373 (5th Cir. 2001) (internal citations omitted).

In his declaration, Green states that during a lockdown, prisoner movement is restricted to ensure the safety and security of inmates and prison personnel and to restore order. *See* [227-

---

[19] As Plaintiff seeks only compensatory and punitive damages as relief, the *Ex Parte Young* exception to the general prohibition on actions against state officials in their official capacity is inapplicable.

6] at 2.  Defendants point out that WCCF was placed on lockdown at various times due to events such as influenza outbreaks, discovery of contraband, and inmate violence. *See* [227-9]. Defendants point out that WCCF was under a facility-wide lockdown between March 13, 2018 and July 2, 2018 and that most of that lockdown period (from April 20, 2018 until July 2, 2018) was ordered by MDOC for all facilities in the state. *See* [228] at 11 (citing [227-9]).  Defendants also note that MDOC again ordered WCCF under facility-wide lockdown on August 13, 2018. *Id*.

Defendants argue that they are entitled to summary judgment because Plaintiff was able to freely move around his cell and suffered no injury as a result of the alleged lack of recreation. In his Response, Plaintiff argues that the denial of privileges was due to collective/group punishment and that the denial of recreation violates WCCF policy. *See* [269] at 34.  However, violations of prison policy and procedure, without more, do not rise to the level of a constitutional deprivation. *See Hernandez*, 788 F.2d at 1158; *Myers*, 97 F.3d at 94.  Moreover, Plaintiff has not demonstrated that the denial of recreation violated his constitutional right because he has failed to demonstrate that Defendants were deliberately indifferent to his health or safety.  Plaintiff has failed to show he suffered a serious injury or was placed at substantial risk of serious harm. *See Hernandez v. Velasquez*, 522 F.3d 556, 560-61 (5th Cir. 2008) (holding that inmate's Eighth Amendment rights were not violated by being placed on lockdown for thirteen months without outdoor exercise, even with evidence of muscle atrophy, loss of range of movement, and depression, because the inmate suffered no serious illness or injury and could not demonstrate deliberate indifference); *see also Boykin v. Bridge*, 2014 WL 1714494, at *6 (N.D. Tex. Mar. 3, 2014) ("Plaintiff has not demonstrated that limited recreation time, or even a complete absence of recreation time for 310 days, violated his Eighth Amendment rights.");

*Gillum v. Gusman*, 2014 WL 931298, at \*12 (E.D. La. Jan. 13, 2014); *Calloway v. Cain*, 2011 WL 1044503, at \*6 (M.D. La. Feb. 14, 2011). Thus, the Defendants are entitled to judgment as a matter of law concerning the claims arising from the denial of recreation.

### First Amendment

Plaintiff alleges that he is a Jehovah's Witness and that Defendant Bradley would not allow him to receive religious literature or allow other Jehovah's Witnesses to come and study with him. Plaintiff also alleges that Bradley would show the inmates religious videos of Bradley's choosing. The Free Exercise Clause of the First Amendment requires the government to refrain from interfering with the religious beliefs and practices of individuals. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). As a prisoner, Plaintiff retains only those First Amendment freedoms which are "not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Therefore, a government regulation may interfere with the religious beliefs and practices of a prisoner if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Pursuant to *Turner*, courts consider four factors in deciding the reasonableness of a regulation: (1) whether there is a rational relationship between the regulation and the legitimate governmental interest asserted; (2) whether the inmates have alternative means to exercise the right; (3) the impact that accommodation of the right will have on the prison system; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id*. at 89-90. Courts must balance the inmates' right to free exercise of religion with the interest of prison officials charged with complex duties arising from administration of the penal system. Prison officials are afforded great deference in carrying out their complex duties.

*O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987); *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002). The *Turner* factors are not weighed equally; the first factor is controlling. *See Scott v. Miss. Dep't. of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992); *Mayfield v. Texas Dep't. of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008).

In his declaration, Green explains that during periods when the facility in not on lockdown, inmates are allowed to meet with the chaplain or other religious personnel visiting the facility, but during periods of lockdown, prisoner movement is restricted and prisoners are not allowed to participate in visitation to ensure the safety and security of inmates and prison personnel and to restore order. *See* [227-6] at 2. The record shows that WCCF was placed on lockdown at various times due to events such as influenza outbreaks, discovery of contraband, and inmate violence. *See* [227-9]. Bradley argues that prison officials have a legitimate penological interest in restricting inmate contact and movement during volatile lockdown periods.

On the other hand, Plaintiff argues that there is "zero rational relationship" between safety concerns and preventing him from meeting and studying with Jehovah's Witness visitors. *See* [269] at 40-41. Courts have held that limitations on visitation may further penological objectives including safety,[20] and the Court finds that there is a rational relationship between safety and security and restricting Plaintiff from meeting and studying with Jehovah's Witness visitors. A prisoner's right to free exercise of his religion "may be curtailed in order to achieve legitimate correctional goals or maintain prison security." *O'Lone*, 482 U.S. at 348. "[T]he safety and security of the prison is a legitimate governmental interest." *Fortner v. Lowndes*

---

[20] *See*, e.g.*, Toppins v. Day*, 73 Fed. Appx. 84, 2003 WL 21757342, at *3 (5th Cir. June 26, 2003); *Overton v. Bazzetta*, 539 U.S. 126 (2003).

*County Adult Detention Center*, 2014 WL 3746642, at \*3 (N.D. Miss. July 29, 2014) (holding that detention facility had a legitimate penological interest in prohibiting inmates in protective custody from attending religious services).

Plaintiff, however, also alleges the Defendants would not allow him to receive religious literature from the would-be visitors, and Defendants have not put forward any legitimate government interest for not allowing Plaintiff to receive religious literature.  There might well be a legitimate penological interest in not allowing Plaintiff to receive religious literature at certain times or under certain circumstances, but Defendant has failed to present one. *See DeMarco v. Davis*, 914 F.3d 383, 389-90 (5th Cir. 2019) (holding that defendant officers must put forward a legitimate governmental interest justifying the confiscation of religious materials); *Mayfield v. Texas Dep't of Criminal Justice*, 529 F.3d 599, 612 (5th Cir. 2008) ("the record does not include reference to a penological interest that would justify limiting access to rune literature in the prison library").  As genuine issues of material fact exist, summary judgment is inappropriate. Accordingly, the Court will deny the Motion for Summary Judgment [227] to the extent Defendants seek a dismissal of Plaintiff's First Amendment claim against Jody Bradley.

### Administrative Remedies Program

Finally, Plaintiff asserts a claim against the ARP Director, Defendant Richard Pennington.  Plaintiff alleges that after he submits grievances, he either receives denials or no response at all.  Plaintiff also alleges that there are significant delays in the ARP process.

The Fifth Circuit has clearly stated that a prisoner "does not have a constitutional right to a grievance procedure at all, and he has no due process liberty interest in having his grievances resolved to his satisfaction." *Staples v. Keffer*, 419 Fed. App'x 461, 463 (5th Cir.2011) (citing *Geiger v. Jowers*, 404 F.3d 371, 373–74 (5th Cir.2005).  Additionally, an inmate does not have a

federally protected liberty interest in having a prison grievance investigated or resolved to his satisfaction. *Geiger*, 404 F.3d at 373–74.  Finally, the failure of any official to follow grievance procedures does not present a constitutional claim. *See Lizotte v. Leblanc,* 456 Fed. App'x 511, 513 (5th Cir .2012); *Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir.1996); *Guiden v. Wilson,* 344 Fed. App'x 980, 981 (5th Cir.2009).  Because Plaintiff does not have a constitutional right to an effective grievance procedure, he cannot maintain his claim against Defendant Pennington.

IT IS, THEREFORE, ORDERED that:

1. The Motion for Summary Judgment [183] is GRANTED.

2. Plaintiff's claims against Defendants Trinity Services Group, Inc. and Delvittia Davis are DISMISSED without prejudice.

3. The Motion for a Temporary Restraining Order and Preliminary Injunction [213] is DENIED.

4. The Motion for Summary Judgment [216] is GRANTED.

5. Plaintiff's claims against Defendants Centurion of Mississippi, LLC, Eshunna Robinson, April Meggs, Nathaniel Reed, and Dr. James Burke are DISMISSED with prejudice.

6. The Motion for Summary Judgment [223] is GRANTED.

7. Plaintiff's claims against Defendants Pelicia Hall, Jerry Williams, Roger Davis, Richard Pennington, Tony Compton, Gloria Perry, Mike Hatten, Chandra Berryman, and Larry Lee are DISMISSED with prejudice.

8. The Motion for Summary Judgment [227] is GRANTED in part and DENIED in part.

9. This action shall continue as to Plaintiff's claims against Defendants MTC, Robert Marquardt, Robyn Williams, Jody Bradley, Gabriel Walker, Tonya Toomey, Terry Daniels, Justin Green, Karen Brown, John Gueho, Delando Miles, and Bessie McKnight concerning the cleanliness of Plaintiff's cell.

10. The action shall continue as to Plaintiff's First Amendment claim against Defendant Jody Bradley.

11. Plaintiff's claims against Justin Green, Robert Marquardt, and Robyn Williams concerning the adequacy of food are DISMISSED without prejudice.

12. All other claims by Plaintiff against Defendants MTC, Jody Bradley, Karen Brown, Briana Chester, Terry Daniel, Bryan Gaston, Justin Green, John Gueho, Chandra Hughey, Michael Johnson, Jacob Jones, Robert Marquardt, Bessie McKnight, Tonya Toomey, Gabriel Walker, Robyn Williams, and Delando Miles are DISMISSED with prejudice.

13. Plaintiff's claims against Defendant Michael King are DISMISSED with prejudice.

14. The Motion to Strike [280] is DENIED as moot.

SO ORDERED this the 18th day of May, 2020.

> s/Michael T. Parker
> UNITED STATES MAGISTRATE JUDGE